ILLINOIS BELL TELEPHONE COMPANY, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

First District (5th Division) No. 1—87—2415

Opinion filed November 3, 1989.

Francine Soliunas and Paul K. Whitsitt, both of Illinois Bell Telephone Company, of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and William H. London, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

Stanley L. Hill & Associates, of Chicago, for respondent Mary Amos.

JUSTICE PINCHAM delivered the opinion of the court:

Petitioner, Illinois Bell Telephone Company, appeals from a decision of the Illinois Human Rights Commission (Commission) that petitioner unlawfully discriminated against petitioner's employee, complainant Mary Amos, in discharging her because of her absenteeism occasioned by her endometriosis disease handicap, and because of petitioner's unreasonable failure to accommodate her handicap. Petitioner

was ordered to reinstate complainant in her employment. We affirm.

The testimony presented at the evidentiary hearing established the following.

Prior to complainant's employment by petitioner, complainant filled out medical forms and underwent a medical examination at petitioner's demand and direction. On the medical forms, complainant stated that she suffered from severe menstrual cramps and pain which could cause her to miss work for one or two days every two months.

In March 1970, petitioner hired complainant as a central office technician, and six months later, petitioner promoted her to the position of central office frameman. Complainant remained in the central office frameman position until she was again promoted in 1974, four years later, to the position of central office maintenance woman, which title was later changed to central office technician.

Complainant's duties as a central office technician entailed testing and maintaining equipment in the toll department. The toll department was part of the central office, and complainant worked in a unit called the "n-carrier unit." As a member of the "n-carrier unit," complainant was allowed to trade off-days with other employees under a system known as the "non-schedule days" system. This system provided employees flexibility and allowed them to alter their work and off-day schedules, and permitted them to work on weekends and have two weekdays off. Other units within the toll department utilized this same flexible "non-schedule days" system in scheduling work and off-days.

In 1978, complainant was transferred to the "pre-service unit" within the toll department, and in 1979, she was transferred out of the toll department and into the "pre-service unit" of the "SSB" department. Neither of these preservice units utilized the flexible "non-schedule days" system in programming employee's duty and off-day assignments. Complainant remained in the "pre-service unit" of the SSB department until February 23, 1981, when petitioner terminated her employment because of complainant's absenteeism.

During complainant's employment with petitioner, she continuously suffered severe menstrual cramps and pain. Complainant initially saw Dr. Moragne but later switched to Dr. Chatman, because he was reputed to be a specialist in a new procedure for diagnosing the cause of menstrual cramps and pain.

On June 5, 1979, Dr. Chatman performed a laparoscopy, a diagnostic procedure, on complainant to determine the cause of her menstrual cramps or dysmenhorrea. Dr. Chatman concluded that the cause of complainant's menstrual cramps was a disease called endometriosis, which caused scar tissue to build up on her uterine lining. Dr. Chatman

prescribed danocrine to aid in dissolving some of the scar tissue. After the laparoscopy and danocrine treatment, complainant's extreme menstrual cramps and pain subsided, but she still experienced severe discomfort.

On April 14, 1980, upon Dr. Chatman's recommendation, complainant underwent further diagnostic surgery to determine the effectiveness of the danocrine treatment. The results were favorable, and Dr. Chatman discontinued the danocrine treatment. Upon the return of her menstrual cycle, however, complainant again began to experience severe pain. Dr. Chatman recommended that complainant "wait and see" how her body would react to the problem.

In December 1980, Dr. Chatman recommended that complainant undergo a laparotomy, a corrective surgical procedure to remove the scar tissue and implants of the endometrium lining. Dr. Chatman scheduled the laparotomy to be performed on January 16, 1981.

In late 1980, at petitioner's request, complainant had a health review by petitioner's medical department. Shortly thereafter, complainant met with Hardin McCain, petitioner's employment manager. McCain told complainant that he had received the results of her health review conducted by petitioner's medical department, and McCain reiterated the hysterectomy recommendation of petitioner's medical department to eliminate her menstrual pains and cramps. Complainant responded that she did not want to have a hysterectomy because she did not want to preclude herself from having children in the future. McCain then told complainant that her next absence from work would result in a one-day suspension and that subsequent absences would result in a five-day suspension with intent to terminate. Complainant informed McCain of her scheduled surgery in January 1981, but McCain reiterated his warning that her absences would result in her suspension. Dr. Chatman was unable to perform the scheduled January 16, 1981, laparotomy because "the disease had progressed so much and so rapidly that it would have been dangerous to do it." Dr. Chatman told complainant that "he would have endangered some other organs" if he had performed the laparotomy. Dr. Chatman again prescribed danocrine.

Complainant was suspended without pay for one day because of her absence from work on December 29, 1980, the cause of which was severe menstrual cramps and pain. On January 16, 1981, she underwent surgery and missed work for 26 days. She returned to work on February 23, 1981, only to be told that she had been suspended with intent to terminate. Petitioner terminated complainant on February 23, 1981.

Shortly after complainant was terminated by petitioner, complainant underwent surgery called presacral neurectomy, a corrective surgery to lessen the pain associated with menstrual cramps.

The record reveals that during the period that complainant was employed in those units which utilized the flexible "non-schedule days" system, complainant was absent from her employment for only five days in 1975, none in 1976 and for only four days in 1977. After being transferred in 1978 to the "pre-service" unit which did not utilize the flexible "non-scheduled days" system, however, complainant's attendance record steadily deteriorated. She was absent from work for nine days in 1978, 26 days in 1979, and 42 days in 1980. Of the 26 days complainant was absent from work in 1979, 15 were due to surgery, and the remaining 11 days she missed were due to her menstrual cramps. In 1980, of the 42 days complainant was absent from work, 20 were due to her menstrual cramps. Finally, between January 1, 1981, and February 23, 1981, the date on which petitioner terminated her, complainant was absent 27 days because of surgery.

Complainant filed her complaint against petitioner with the Illinois Department of Human Rights (Department), alleging that petitioner unlawfully discriminated against her on the basis of her sex and her handicap, to wit, endometriosis. An investigation was conducted, and on March 23, 1983, the Department filed a complaint of civil rights violation against petitioner. In its complaint, the Department alleged that petitioner discriminated against complainant because of her female sex and her endometriosis disease handicap.

The Department held an evidentiary hearing over a five-day period before administrative law judge (ALJ) Sandra Y. Jones. ALJ Jones presided over the complete evidentiary hearing until its conclusion but resigned from the Commission before writing her interim recommended order and decision. Prior to her resignation from the Commission, however, ALJ Jones prepared a report of her findings, conclusions and her impressions of the testimony presented at the evidentiary hearing, which she submitted to Richard J. Gonzalez, the substituting administrative law judge. ALJ Gonzalez prepared the interim recommended order and decision.

In his interim recommended order and decision, ALJ Gonzalez alluded to ALJ Jones' resignation and cited the basis of his authority to write the interim order and decision. ALJ Gonzalez based his order and decision on an examination of the record and on the written report of ALJ Jones' findings, conclusions and impressions of the testimony.

ALJ Gonzalez found that the preponderance of the evidence sustained the complainant's complaint of handicap discrimination but he

dismissed complainant's charge of sex discrimination on the ground that petitioner's articulated reason of excessive absenteeism was not a pretext for unlawful sex discrimination. ALJ Gonzalez concluded that endometriosis was a handicap within the meaning of the Illinois Human Rights Act (Act) (Ill. Rev. Stat. 1987, ch. 68, par. 1—103), and with reasonable accommodation, would not affect complainant's ability to perform her job. ALJ Gonzalez specifically noted that the designation "modification of work schedules" in section 4(a) of the Commission's rules was the type of accommodation contemplated within petitioner's organization which provided a degree of flexibility to employees in their work schedules, namely the aforementioned flexible "non-schedule days" system. ALJ Gonzalez further found that complainant's particular handicap was well suited for accommodation because it involved predictable periods of disability.

ALJ Gonzalez also noted that section 4(a) of the Commission's rules "places a burden upon the employer to show that a requested accommodation could either be overly expensive or unduly disrupt the conduct of its business." ALJ Gonzalez pointed out that petitioner already had in place a mechanism, the flexible "non-schedule days" system, which could have accommodated complainant and reduced her absent days to an acceptable number, but petitioner refused to accommodate her for reasons which were directly related to her handicap.

Petitioner's express reasons for failing to accommodate complainant were that petitioner's overall staffing balance would have been upset and that complainant's transfer would have contravened a company policy that required good attendance as a condition to a transfer. The Commission found that petitioner had failed to rebut complainant's *prima facie* case of handicap discrimination by petitioner. ALJ Gonzalez found that because transfers were not unusual in petitioner's large organization, petitioner could have accommodated complainant by exchanging her with another employee working in a unit that utilized the "non-scheduled days" system. As to petitioner's policy requiring good attendance as a condition of transfer, ALJ Gonzalez stated:

> "Whatever value such policy may have in the abstract, adherence to this policy cannot justify a failure to accommodate when the precise reason for the transfer request is to improve attendance. In a sense, the mere existence of the policy is proof of [petitioner's] refusal to meet its affirmative duty to reasonably accommodate its employee."

ALJ Gonzalez concluded that petitioner's failure to transfer complainant to a unit utilizing the "non-scheduled days" system was an unrea-

sonable refusal to accommodate her handicap in light of the overwhelming evidence that petitioner could have done so. ALJ Gonzalez found that petitioner unlawfully discriminated against complainant on the basis of her handicap when petitioner unreasonably refused to provide available "non-schedule days" employment accommodation to complainant.

On July 8, 1985, petitioner filed its exceptions to ALJ Gonzalez's interim order. ALJ Gonzalez filed his recommended order and decision on September 19, 1985. On June 9, 1986, the Commission issued its order and decision. On June 30, 1986, petitioner filed an application for rehearing before the entire Commission. The Commission set oral arguments for November 19, 1986. On April 1, 1987, the Commission issued its order and decision that petitioner had unlawfully discriminated against complainant on the basis of her endometriosis disease handicap. On July 31, 1987, the petitioner appealed pursuant to section 8—111 of the Act (Ill. Rev. Stat. 1987, ch. 68, par. 8—111(A)(3)).

Petitioner contends before us that it was error for ALJ Gonzalez to prepare a recommended order and decision when he was not the ALJ who presided over the evidentiary hearing and did not hear the witnesses or observe them testify. Petitioner argues that because ALJ Jones presided over the evidentiary hearing, the substitution of ALJ Gonzalez to prepare the recommended order and decision was erroneous. In support of its contention, petitioner relies on *Quincy Country Club v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 497, 498 N.E.2d 316. Such reliance is misplaced because *Quincy* is clearly distinguishable from the case at bar.

In the instant case, the facts were uncontroverted and the witnesses' credibility was not an issue. The fact of complainant's absenteeism occasioned by her illness, from the surgery for her menstrual cramps and pain, and endometriosis was undisputed. The issues before the ALJ were legal, namely, whether complainant's physical condition constituted a handicap cognizable under the Act, and whether because thereof petitioner unreasonably discriminated against complainant in refusing to adjust complainant's work assignment to enable her to avoid her absences. Conversely, *Quincy* involved sex discrimination, and the facts were totally contested and the witnesses' credibility was not only an issue, it was the issue. Moreover, the complainant in *Quincy* did not contend that her conduct of which her employer complained was occasioned by any handicap on her part.

In *Quincy*, a substitute administrative law judge, who did not hear the evidence or observe the witnesses, prepared the interim recommended order and decision. The substituting ALJ in *Quincy* as in the

case at bar based his order and decision on an examination of the record and on impressions of the credibility of the witnesses written by the ALJ who presided over the evidentiary hearing but who resigned from the Commission before preparing her interim recommended order and decision. Quincy Country Club's defense against the complainant's charge of sex discrimination was that it experienced cash shortages at the bar at which complainant worked, which the complainant denied and which presented the issue of truthfulness and therefore required the hearing officer to carefully evaluate the witnesses' demeanor and credibility during the hearing. The employer and the complainant in *Quincy* disputed the evidence on practically every crucial element, thereby necessitating the ALJ's ability to observe the witnesses' demeanor and assess their credibility to be a paramount requirement. The court in *Quincy* held that where the witnesses' credibility is the determining factor, the presiding administrative law judge must participate in the decision and the substituting ALJ's interim recommended order and decision based on his examination of the record and the presiding judge's written impressions of the witnesses' credibility were invalid. *Quincy*, 147 Ill. App. 3d 497, 500, 498 N.E.2d 316, 318-19.

As previously stated, the credibility of the witnesses in the case at bar was not a controverted factor. Unlike in *Quincy*, ALJ Gonzalez relied on uncontroverted employment and medical records and on the undisputed testimony of the witnesses to reach a decision. Petitioner's defense in the case at bar was based on the construction and interpretation of the statutes involved and the application of the Commission's rules and regulations, rather than on the credibility of the witnesses. In the case at bar, petitioner did not contest complainant's truthfulness when petitioner asserted that complainant was terminated because she was excessively absent from work because of her illness. Accordingly, substituting ALJ Gonzalez properly relied on presiding ALJ Jones' impressions of the witnesses and on his own examination of the record in preparing his recommended order and decision. *Quincy* is inapplicable to this case.

■■ ■ Additionally and more importantly, complainant contends that petitioner waived the issue of the substitution of ALJ Gonzalez for ALJ Jones when petitioner failed to raise the issue at any time during the administrative proceedings below. Complainant's position is well founded and valid. It is fundamental that issues not raised during an administrative proceeding are waived and will not be considered for the first time on appeal. (*Heeren Co. v. Human Rights Comm'n* (1987), 150 Ill. App. 3d 234, 502 N.E.2d 17; *Village of Cary v. Pollution Con-*

*trol Board* (1980), 82 Ill. App. 3d 793, 403 N.E.2d 83; *Wegmann v. Department of Registration & Education* (1978), 61 Ill. App. 3d 352, 377 N.E.2d 1297.) Petitioner had ample opportunity during the administrative proceedings to raise the ALJ substitution issue but neglected to do so. Petitioner knew in advance that ALJ Gonzalez was substituting for ALJ Jones, and petitioner could have raised the issue in petitioner's July 8, 1985, exceptions to the ALJ's interim order; in petitioner's June 30, 1986, petition for rehearing before the Commission; and during petitioner's November 19, 1986, oral argument before the Commission, but petitioner failed to do so. Accordingly, petitioner cannot raise the issue for the first time on appeal and has waived it.

■ Petitioner concedes that it failed to raise the ALJ substitution issue during the administrative proceedings but argues that the Commission acted without jurisdictional authority when it adopted the order and decision of ALJ Gonzalez, who did not preside over the evidentiary hearing, and therefore, petitioner urges, the issue can be raised for the first time on appeal. We disagree. Section 8—106(I)(1) states:

"When all the testimony has been taken, the hearing officer [ALJ] shall determine whether the respondent has engaged in or is engaging in [a] civil rights violation ***." (Ill. Rev. Stat. 1987, ch. 68, par. 8—106(I)(1).)

In addition, sections 8—107(E)(1) and (E)(2) state:

"(1) Following the filing of the findings and recommended order of the hearing officer [ALJ] *** the Commission *** shall review the record *** [and]

(2) *** shall adopt the hearing officer [ALJ's] findings of fact if they are not contrary to the manifest weight of the evidence." (Ill. Rev. Stat. 1987, ch. 68, pars. 8—107(E)(1), (E)(2).)

Thus, the Commission's function is to review the recommendations and findings of the ALJ hearing officer and adopt the factual findings if they are not against the manifest weight of the evidence. We have found no decided case directly on point, but we believe that the Commission's authority to review an ALJ hearing officer's findings and recommendations is not dependent on which particular ALJ prepares the recommendation order. We are of the opinion that the Commission's authority to review is neither invoked nor revoked because a substitute ALJ prepared the interim order and decision.

■ Petitioner next contends that endometriosis disease is not a handicap within the meaning of the Act and argues that the Commission therefore erroneously applied the Act to endometriosis. Factual findings by an administrative agency are *prima facie* correct and may not be set aside unless they are against the manifest weight of the

evidence. (*Clark Oil & Refining Corp. v. Golden* (1983), 114 Ill. App. 3d 300, 448 N.E.2d 958.) A reviewing court, however, is not bound to give the same deference to an administrative agency's conclusions of law and statutory construction as would be given factual findings, on which a reviewing court must exercise independent review and judgment. (*Carson Pirie Scott & Co. v. Department of Employment Security* (1987), 164 Ill. App. 3d 530, 518 N.E.2d 161; *Flex v. Department of Labor, Board of Review* (1984), 125 Ill. App. 3d 1021, 1023-24, 466 N.E.2d 1050, 1053.) Moreover, an administrative agency's statutory interpretations are not binding on a reviewing court and will be overturned if found to be erroneous. *Moore v. Board of Trustees of the Sanitary District Employees' & Trustees' Annuity & Benefit Fund* (1987), 157 Ill. App. 3d 158, 510 N.E.2d 87.

 In determining whether endometriosis is a handicap within the meaning of the Act, we must look to the purpose for which the Act was enacted and read the Act as a whole, mindful of all relevant parts such that each word, clause and section is given a reasonable meaning. (*People v. Jordan* (1984), 103 Ill. 2d 192, 206-07, 469 N.E.2d 569, 576.) Where a statute is clear, however, we may not depart from its clear language. *Harvey Firemen's Association v. City of Harvey* (1979), 75 Ill. 2d 358, 363, 389 N.E.2d 151, 153.

The pertinent provision of the Act, section 1—103(I), defines a handicap as:

> "[A] determinable physical or mental characteristic of a person including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or a support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic:
>
> (1) *** is unrelated to the person's ability to perform the duties of a particular job or position." (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(I)(1).)

Thus, the plain language of section 1—103(I) provides that an individual may be protected by the Act when he or she has a determinable physical characteristic which results from a disease and which is unrelated to his or her ability to perform a particular job or function, or when his or her condition is perceived as a handicap.

The supreme court construed handicap to include at least those individuals whose condition in fact hindered them from engaging in major life activities, and a major life activity encompasses employment. (*Lyons v. Heritage Restaurants, Inc.* (1982), 89 Ill. 2d 163, 170, 432

N.E.2d 270.) The Commission's rule on handicap discrimination in employment, section 2500.20(b), provides guidance on what may be considered a "determinable physical or mental characteristic." The Commission's rule states as follows:

"(1) The definition is not confined to only those physical and mental conditions which are grave or extreme in nature. However, it is interpreted as excluding:

(A) conditions which are transitory and insubstantial, and

(B) conditions which are not significantly debilitating or disfiguring.

(2) To be covered, a condition must be 'determinable' by recognized *** diagnostic techniques." (56 Ill. Adm. Code 2500.20(b) (1985).)

In applying the foregoing principles to the case at bar, it is clear that the Commission correctly construed the provisions of section 1—103(I) as applying to endometriosis. In the case at bar, complainant underwent a laparoscopy, and the disease of endometriosis was determined to be the source of her dysmenhorrea. In applying its rules on handicap discrimination, the Commission concluded that complainant was in fact handicapped. Administrative agencies are afforded substantial discretion by a reviewing court in construing and applying their own rules, and a reviewing court should interfere only where the agency's interpretation is plainly erroneous or inconsistent with long-settled constructions. *Neff v. Miller* (1986), 146 Ill. App. 3d 395, 402, 496 N.E.2d 1073, citing *Phillips v. Hall* (1983), 113 Ill. App. 3d 409, 421, 447 N.E.2d 418.

Petitioner argues that the Commission's decision that complainant's condition constituted a handicap conflicts with a prior Commission decision that dysmenhorrea was not a handicap. (*Handzik & Electromotive Division of General Motors Division* (1986), 6 Ill. HRC Rep. 176.) We disagree. *Handzik* is distinguishable from the case at bar.

In *Handzik*, the Commission simply ruled that Karla Handzik's dysmenhorrea did not constitute a handicap within the meaning of the Act because she failed to establish that her dysmenhorrea was caused by either a disease, a congenital condition of birth or a functional disorder. In the case at bar, however, the undisputed evidence presented to the Commission was that complainant's painful menstruation, dysmenhorrea, was caused by the disease, endometriosis. Thus, unlike in *Handzik*, the complainant in the case at bar fell within the protection of the Act when she established that her physical impairment resulted from the disease endometriosis. Accordingly, in this case the Commission was correct in concluding that complainant's endometriosis consti-

tuted a handicap within the meaning of the Act. We are mindful of the plight of the large number of women who are afflicted by severe menstrual pain, and we recognize that all such conditions are not necessarily physical handicaps, but must be determined from the facts of each case. We are also aware of the intent of the legislature to protect only those who are handicapped within the meaning of the Act.

The Act provides for the protection of handicapped individuals from unlawful discrimination in employment. Section 2—102(A) expressly states:

"It is a civil rights violation:

\*\*\* For any employer \*\*\* to act with respect to recruitment, \*\*\* selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A).

Section 1—103(Q) defines the words "unlawful discrimination" as including discrimination against a person because of his handicap. (Ill. Rev. Stat. 1987, ch. 68, par. 1—103(Q).) "Handicap" is defined in section 1—103(I) of the Act.

■ Illinois courts have adopted the three-step analysis enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, in analyzing employment discrimination cases under the Act. (See *Village of Oak Lawn v. Illinois Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.) The complainant has the initial burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination. Once a complainant has met this burden, the employer may rebut it by articulating some legitimate, nondiscriminatory reason for its employment decision. If the employer meets this burden, the complainant must prove by a preponderance of the evidence that the employer's proffered reason was not a legitimate reason, but merely a pretext for the unlawful discrimination. *Caterpillar, Inc. v. Human Rights Comm'n* (1987), 154 Ill. App. 3d 424, 506 N.E.2d 1029; *Lipsey v. Human Rights Comm'n* (1987), 157 Ill. App. 3d 1054, 510 N.E.2d 1226; *Village of Oak Lawn v. Human Rights Comm'n* (1985), 133 Ill. App. 3d 221, 478 N.E.2d 1115.

■ Under the Act, a *prima facie* case of discrimination based upon a physical handicap is shown by establishing that the employee is handicapped, that an adverse job action related to the handicap was taken against the employee, and that the handicap is unrelated to the employee's ability to perform the job. *Milan v. Human Rights Comm'n* (1988), 169 Ill. App. 3d 979, 523 N.E.2d 1155; *Kenall Manufacturing*

*Co. v. Human Rights Comm'n* (1987), 152 Ill. App. 3d 695, 504 N.E.2d 805.

▉ Applying these criteria to the case at bar, the complainant presented sufficient evidence to establish a *prima facie* case of discrimination based upon a physical handicap. The Commission was correct in construing the Act as applying to the complainant's endometriosis. There was sufficient evidence to support the Commission's findings that complainant's handicap was unrelated to her ability to perform her job.

Based on the corroborated testimony of complainant's supervisors, coupled with complainant's performance and employment history, the Commission found that not only did complainant possess the requisite skills to perform her job functions but petitioner was so satisfied with her work that it promoted her from the clerical to the office technician position. Clearly, petitioner would not have promoted complainant if she was unable to perform the duties of her promoted position.

▉ Complainant may also be afforded protection under the Act upon a showing that her condition was perceived of by her employer as a handicap. There is sufficient evidence to support the Commission's finding that complainant satisfied this requirement. Hardin McCain, petitioner's manager, summed up petitioner's perception of complainant's condition in its responses to the following questions:

"Q. Well, now wait a minute, Mr. McCain, Mary returned to work on February 23rd, isn't that right, of 1981?

A. According to that, yes.

Q. And you met with Mary on February 23rd of 1981, isn't that right?

A. This is the date she was suspended with intent to dismiss?

Q. Correct.

A. Yes, I recall now.

Q. Why did you not give her a three day suspension at that time?

A. Because when I had called the medical department and asked them about her results, they said [t]he surgery that she had was not the type that was going to rpevent [*sic*] her from having her old problem again, and that was as far as it could be told, there had been no change in her physical being.

Q. Why did you skip a step Mr. McCain?

A. Because it was the end of the line, if you are not going to improve, if there is nothing that had to be done, correctively, for her to improve, it was no need to keep her there."

Thus, petitioner's employee admitted in these foregoing responses that complainant was discharged because petitioner perceived no change in her physical condition after surgery. The Commission was therefore correct in finding that the decision to terminate complainant was based on petitioner's perception of complainant's physical handicap, endometriosis.

Next, petitioner contends that the Commission's finding that complainant could have been accommodated by transferring her to another position was erroneous as a matter of law and against the manifest weight of the evidence. Petitioner also argues that an employer has no duty to accommodate a handicapped employee by way of a reassignment or transfer to another position. Petitioner further argues that complainant's numerous extended absences could not have been reduced even if she was placed in a unit that utilized the flexible "non-schedule days" system. We disagree with these contentions.

■■ An employer's duty to accommodate handicapped workers attaches when the employee asserts or claims that he or she would have performed the essentials of the job if afforded reasonable accommodation. (*Carty v. Carlin* (D.C. Md. 1985), 623 F. Supp. 1181, 1186.) Moreover, the Commission's rule places the burden on the employee to assert the duty and to show that the accommodation was requested and necessary for adequate job performance. *Milan v. Human Rights Comm'n* (1988), 169 Ill. App. 3d 979, 523 N.E.2d 1155.

■■ There is ample evidence in the record that complainant satisfied this burden. The record reveals that in 1974, complainant worked in the "n-carrier unit" of the toll department, which was part of the central office. The "n-carrier unit" utilized the flexible "non-scheduled days" system. Complainant was subsequently transferred to another unit within the same toll department that did not utilize the "non-scheduled days" system. The duties of both the "n-carrier" and the "pre-service" units were not significantly different or particularly unfamiliar to the complainant since she had worked in both units. Placing her in a unit that utilized the flexible "non-scheduled days" system would have provided complainant with the means of scheduling around the predictable days when she would be disabled.

The Commission found that complainant maintained a satisfactory attendance record while she was a member of the unit that utilized the flexible "non-schedule days" system. Complainant's attendance deteriorated once she was placed in a unit that did not utilize the flexible "non-scheduled days" system. Her deteriorating attendance was in large part due to petitioner's refusal to transfer her into a unit that utilized the flexible days system. Petitioner failed to implement the re-

quired reasonable accommodation which would have permitted complainant to rectify her attendance problem and overcome her handicap.

The Supreme Court in *School Board v. Arline* (1987), 480 U.S. 273, 287 n.17, 94 L. Ed. 2d 307, 321 n.17, 107 S. Ct. 1123, 1131 n.17, quoting *Southeastern Community College v. Davis* (1979), 442 U.S. 397, 410, 412, 60 L. Ed. 2d 980, 990, 992, 99 S. Ct. 2361, 2369, 2370, formulated a standard for determining when an accommodation by an employer is unreasonable, when it stated that an accommodation is unreasonable "if it either imposes 'undue financial and administrative burdens' *** or requires 'a fundamental alteration in the nature of the program.' " These criteria have been interpreted by the Commission's rules as placing a burden upon an employer to show that a requested accommodation would either be overly expensive or would unduly disrupt the conduct of its business.

There is ample evidence to support the Commission's findings that placing complainant in one of the toll department units that utilized the "non-schedule days" system would not have been overly expensive or unduly disrupt petitioner's business. The mechanism for accommodating complainant's handicap was already in place. The Commission stated:

> "This case is unusual in that rarely can a [c]omplainant so demonstratively show that the sought accommodation would alleviate any problem caused by the handicap. Because [c]omplainant previously worked under the 'non-scheduled days' system within the 'carrier' unit, she could show beyond any doubt that it was an effective accommodation for her handicap, eliminating the need for any speculation on the part of the trier of fact."

For the foregoing reasons, the Commission's decision that petitioner unlawfully discriminated against complainant when it unreasonably failed to provide available accommodations to her handicap, endometriosis, was not against the manifest weight of the evidence.

Accordingly, the Commission's decision and order is affirmed.

Affirmed.

COCCIA and LORENZ, JJ., concur.