FOURTH DIVISION

December 13, 2001

No. 1-00-2155

PETER B. VAN CAMPEN,     )    

)

    Petitioner-Appellant and Cross-Appellee, ) 

     )      Appeal from

v. )   the Human Rights

     )      Commission

INTERNATIONAL BUSINESS MACHINES CORPORATION, )   

)   

    Respondent-Appellee and Cross-Appellant  )  No.     1990-CN-3803

)  ALS No. 5127      

(The Human Rights Commission, )

)

    Respondent-Appellee). )

  

     JUSTICE THEIS delivered the opinion of the court:

Complainant, Peter Van Campen, filed a charge of discrimination against respondent, International Business Machines Corporation (IBM), with the Illinois Department of Human Rights and a complaint with the Illinois Human Rights Commission (Commission).  In these documents, Van Campen alleged that IBM discriminated against him based on a handicap in violation of the Illinois Human Rights Act (the Act).  Ill. Rev. Stat. 1989, ch. 68, par. 1-101 
et seq
. (recodified at 775 ILCS 5/1-101 
et seq
. (West 2000)).  After a 17-day hearing, the administrative law judge (ALJ) found that Van Campen failed to prove a 
prima facie
 case of handicap discrimination and recommended that the Commission dismiss his complaint with prejudice.  The Commission affirmed and adopted, in part, the decision of the ALJ, finding that Van Campen was not handicapped as defined in the Act.  Van Campen now appeals, arguing that the Commission erred in (1) concluding that Van Campen's disability was related to his ability to perform his job and, thus, he was not handicapped under the Act; and (2) dismissing the complaint even though IBM failed to consider the possibility of reasonable accommodation.  IBM cross-appeals, contending that the Commission erred in not affirming alternative bases for the ALJ's decision and that additional grounds on which this court could affirm are present in the record.  For the reasons set forth below, we affirm.

The Commission made the following factual findings based on the evidentiary hearing before the ALJ and the ALJ's recommended decision.  Van Campen worked for IBM from 1973 to May 1990 in various capacities.  In December 1987, Van Campen was promoted to account systems engineer (SE), which involved overseeing the installation of IBM operating systems at clients' offices and trouble-shooting for clients with IBM software.  Van Campen received three performance awards in 1989, two for his role as part of a team of IBM employees for a large sale to Citicorp.  Since 1989, Van Campen has suffered from an immune deficiency which caused him to be more susceptible to, and ill from, minor illnesses.  Additionally, Van Campen was clinically depressed, sometimes making it difficult to wake up in the morning.  IBM management referred employees with medical conditions to IBM's medical department (IBM Medical), which made all determinations as to the appropriateness and nature of an accommodation.  

Van Campen's supervisor in 1988 and 1989, Verlene Gardner, testified that Van Campen was required to be at work and on time during business hours and to telephone her when he would be absent or late.  At IBM, the business day lasted from 8:30 a.m. to 5 p.m., with one hour for lunch.  When an employee was absent, his manager was required to have another SE cover the absent employee's responsibilities.  On at least two occasions, Gardner was unable to locate Van Campen during business hours.  Both times, she informed Van Campen that she needed to know where he was during the workday. 

In November or December of 1989, Van Campen's new supervisor, Mike Hlebasko, attempted to contact him.  When he found Van Campen at home, Hlebasko told him to be at work during business hours and to inform Hlebasko if he would be working from home.  Van Campen missed work twice in December 1989 and did not return Hlebasko's calls or inform him of his absence until the next day, despite warnings from Hlebasko.  Van Campen was absent due to illness approximately 13 times in 1989.

On January 18, 1990, Van Campen called Dr. Foster at IBM Medical and explained that he was having difficulty arriving at work on time.  Foster told him to try to reduce the amount of absences and wake up earlier in the morning.  Van Campen missed work due to illness without informing Hlebasko on January 22, 1990.  Foster told Hlebasko that she needed signed medical releases from Van Campen so that she could speak with his physicians.  Hlebasko told Van Campen to give IBM Medical a release and informed him that a condition of his employment was adherence to IBM's attendance policy.  Van Campen was absent again on January 25, 1990.

After Van Campen saw Foster on January 26, 1990, Foster sent Hlebasko a note stating that Van Campen was doing well.  Hlebasko informed his supervisor, Bill Brennan, that Van Campen was consistently absent and it was affecting his job performance.  In January or February, Brennan learned that Van Campen had missed meetings with Citicorp.  Additionally, Van Campen failed to timely respond to work-related phone calls.  At this time, Hlebasko began keeping notes of his conversations with Van Campen.

IBM's progressive discipline procedure for handling employee attendance problems called for, first, a verbal warning or counseling and, second, the issuance of a condition of employment (COE) letter, which informed the employee that his or her behavior was unacceptable and what the employee could do to remedy the situation.  If the problem persisted, IBM terminated the employee.  

Van Campen missed work March 1 and 2, calling to inform Hlebasko only on March 2.  That day, Hlebasko learned that Van Campen failed to fill two software orders for Citicorp and later learned that Van Campen failed to order cables for another client.  When Van Campen returned to work on March 3, Hlebasko reiterated that he needed to be advised if Van Campen would not be at work. 

On March 13, 1990, Van Campen again missed work and did not respond to an emergency software problem at Citicorp.  When Hlebasko met with Van Campen, Van Campen first informed Hlebasko of his depression and immune deficiency.  Hlebasko asked Van Campen to see IBM Medical and informed him that his work was deficient.  Hlebasko then imposed a requirement on Van Campen that he call Hlebasko the first thing every morning to advise him that he was at work.  While Van Campen was the only employee under such an obligation, he was the only employee who was occasionally unavailable to Hlebasko during working hours.  

On March 16, 1990, Van Campen was late to work, but did not call Hlebasko.  On April 6, 1990, Van Campen left Hlebasko a message at noon, stating that he was working at Citicorp that day.  On April 10, Van Campen phoned Hlebasko at 8 a.m. and 10 a.m., saying he would be late.  Van Campen failed to call Hlebasko on April 11, but gave him a doctor's note at 2:30 p.m.  Hlebasko discussed Van Campen's attendance with Brennan on April 12.  Brennan advised Hlebasko to issue Van Campen a COE letter.

Van Campen met with Brennan on April 12 and explained that he suffered from depression, diarrhea, and side effects of medication.  He stated he was not able to arrive at work on time and asked Brennan to get Hlebasko "off his back."  Brennan informed Van Campen that he needed an orderly work schedule because employees were dependent on each other and stated that Van Campen needed to come to work on time or risk his job.  Brennan further told Van Campen that his doctors should speak with IBM Medical concerning his condition and any special accommodations.  When Van Campen replied that his doctors would not provide this information, Brennan stated that his doctors were costing him his job.

On April 16 or 17, 1990, Hlebasko met with Van Campen, discussed his attendance record, and issued a COE letter.  The letter stated Hlebasko's concerns about Van Campen's absenteeism and tardiness and IBM Medical's opinion that he was fit for work and imposed several conditions on his employment.  Van Campen was to report to work, either at One IBM Plaza or a client location, from 8:30 a.m. to 5 p.m., Monday through Friday.  In the event of illness, he must contact a supervisor by 8:30 a.m. and present a doctor's note stating the date and nature of treatment.  Van Campen, Hlebasko and Foster then had a conversation where Van Campen explained that his condition prevented him from arriving at work on time, he did not want to release personal information to IBM Medical, and it was difficult to be "constrained" by reporting to work every day at a fixed time. 

On April 20, Van Campen met with Brennan and Hlebasko regarding the COE letter.  Brennan informed Van Campen of the seriousness of the situation and that he was in danger of losing his job.  Brennan again asked Van Campen to have his doctors release information to IBM Medical, but Van Campen replied that his doctors would not do so.  Brennan warned Van Campen that his doctors would cause his termination.  Ultimately, Brennan revoked the COE letter based on Van Campen's assertion that he was at Citicorp on April 10.  Brennan instructed Van Campen to inform Hlebasko of his whereabouts.  

On April 23, Van Campen called Hlebasko late at 8:55 a.m.  Hlebasko then met with Van Campen at Brennan's insistence.  Van Campen gave Hlebasko a letter from one of his treating doctors to an insurance company which assessed his psychological condition.  The letter did not state that Van Campen needed an accommodation.  

Van Campen called in sick on April 26.  On May 3, Van Campen did not call Hlebasko until 10 a.m.  In May, Hlebasko asked one of Van Campen's coworkers to perform some of Van Campen's job responsibilities.  Hlebasko also reviewed Van Campen's performance and instructed him that his performance was slipping and that he needed to adhere to IBM's attendance policy.  On May 4, Van Campen called to say he would be late for work.  In their next meeting, Hlebasko issued a COE letter that was substantially the same as the previous letter.  Van Campen then met with Hlebasko and Brennan's supervisor, explaining that his medical conditions prevented him from arriving at work on time.  The supervisor told Van Campen to execute medical releases for IBM Medical.

On May 9 and May 16, Van Campen arrived late to work.  When Hlebasko met with Van Campen on May 17, Van Campen stated he was late due to his medical conditions and indicated a reluctance to execute a blanket medical release.  Van Campen did not call Hlebasko the next morning.  On May 21, Van Campen told Hlebasko he was not feeling well so Hlebasko sent Van Campen to IBM Medical.  Van Campen left Hlebasko a message that, although IBM Medical cleared him to return to work, he was still sick and went home.  Van Campen did not report to work on May 22. 

Hlebasko then spoke with Brennan, who told Hlebasko to obtain a doctor's note from Van Campen and to fire him if he did not have one.  Hlebasko left a message at Van Campen's home telling him to bring a doctor's note describing the nature of his treatment and that he was unable to work.  At their meeting, Van Campen presented Hlebasko with a doctor's note dated May 22, stating "rule out hepatitis."  Hlebasko stated that the note did not cover his absence of May 21 and did not explain that Van Campen could not have returned to work.  Hlebasko then fired him.  In 1989 and 1990, Van Campen never executed a medical release or provided IBM Medical with medical evidence of his conditions which prevented him from arriving at work on time or from calling in when he would be late or sick.

The testimony of Gardner, Hlebasko, Brennan and Foster established that Van Campen's job required him to be at work, on time, on a regular, consistent basis from 8:30 a.m. until 5 p.m.  Hlebasko testified that SEs were required to be at work during normal business hours, with an 8:30 a.m. start time.  Gardner stated that IBM had a standard policy that required employees to call their supervisors at the start of the workday, or as soon as feasible, when they would be late or absent.  The ALJ found that implicit in this notification is acknowledgment of the fact that IBM expected SEs to be at work at 8:30 a.m.  The Commission found that Van Campen's position was "customer driven" and SEs must be available at all times for their clients.  IBM did not require SEs to arrive at work at 8:30 a.m. if they worked late the night before and notified their managers that they would be late.  Van Campen did not testify that he was late to work due to working late the previous night.  

In 1989 and 1990, IBM had a flex-time policy that required an employee to report to work at the same, fixed time every day, but changed the hours slightly from the regular 8:30 a.m. to 5 p.m. schedule.  Flex-time had to be formally requested and approved by the employee's manager.  However, Hlebasko testified that flex-time was not available for employees in his department.  Further, Van Campen never requested a later start time through the flex-time policy, but requested a flexible schedule that could vary day-to-day depending on how he was feeling.  The Commission found that the nature of Van Campen's job, in which he may be needed by a client at any time, did not permit an unacceptable amount of leave without causing undue burden or expense to IBM.  

Van Campen's doctors testified to his depression, personality disorders, immunological deficiency, frequent diarrhea and minor illnesses, and hypothyroidism.  Due to these conditions, Van Campen needed to immediately handle any minor illnesses or diarrhea and could not predict when these conditions would occur.  Additionally, he might have difficultly waking in the morning due to his depression and sometimes could not make it to work on time.  Relying on the testimony of Van Campen's doctors, the ALJ concluded that Van Campen's physical and psychological conditions made him unable to adhere to a structured routine work schedule and that a formal, fixed flex-time schedule would not have aided him.

At the conclusion of the hearing, the ALJ issued her recommendation to dismiss Van Campen's complaint with prejudice, finding that he did not establish that his medical conditions were "handicaps" under the Act because those conditions were related to his ability to perform his job.  In assessing credibility, the ALJ found Hlebasko, Brennan, Foster, and Gardner credible, while discounting Van Campen's testimony.  The ALJ also found that Van Campen failed to prove a 
prima facie
 case of discrimination, IBM presented credible evidence that it terminated Van Campen for a legitimate, nondiscriminatory reason, and Van Campen did not establish that IBM's reason was a pretext for discrimination.  After Van Campen filed exceptions to this recommendation, the Commission affirmed and adopted the ALJ's decision, except on the ground that Van Campen failed to execute a full medical release.  The Commission then dismissed Van Campen's complaint, prompting this timely appeal.  

When reviewing an administrative agency's decision, its factual findings are deemed 
prima facie
 true and correct and will not be disturbed unless they are against the manifest weight of the evidence.  
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998).  We cannot substitute our judgment for that of the Commission, nor may we reweigh any evidence presented at the hearing, resolve any factual disputes or assess credibility.  
Chicago Housing Authority v. Human Rights Comm'n
, No. 1-99-3885 (October 12, 2001).  The Commission's legal analysis, however, is not entitled to such deference.  Because this case involves a mixed question of fact and law, we will apply the clearly erroneous standard of review, which rests between manifest weight of the evidence and 
de novo
, when examining the Commission's decision.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  We can affirm the decision on any basis present in the record.  
Rogy's New Generation, Inc. v. Department of Revenue
, 318 Ill. App. 3d 765, 771, 742 N.E.2d 443, 448 (2000).

The Illinois Human Rights Act prohibits discrimination in employment against the physically and mentally handicapped.  775 ILCS 5/1-101 
et seq
. (West 2000); 
Raintree Health Care Center v. Illinois Human Rights Comm'n
, 173 Ill. 2d 469, 479, 672 N.E.2d 1136, 1141 (1996).  In analyzing employment discrimination claims under the Act, Illinois courts apply the three-part test set out by the United States Supreme Court in 
McDonnell Douglas Corp. v. Green
, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).  
Zaderaka v. Illinois Human Rights Comm'n
, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684, 687 (1989).  First, plaintiff must establish a 
prima facie
 case of unlawful discrimination by a preponderance of the evidence.  
Raintree
, 173 Ill. 2d at 481, 672 N.E.2d at 1141.  Second, to rebut the presumption of unlawful discrimination, the employer must articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the employer establishes a legitimate reason, plaintiff must prove that the reason was merely a pretext for unlawful discrimination.  
Raintree
, 173 Ill. 2d at 481, 672 N.E.2d at 1141.

In order to establish a 
prima facie
 case of handicap discrimination, plaintiff must prove that (1) he is handicapped as defined within section 1-103(I) of the Act; (2) an adverse job action was taken against him because of the handicap; and (3) his handicap is unrelated to his ability to perform the functions of the job.  
Harton v. City of Chicago Department of Public Works
, 301 Ill. App. 3d 378, 385-86, 703 N.E.2d 493, 498 (1998).  "Handicap" is defined under the Act as "a determinable physical or mental characteristic of a person *** which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic *** is unrelated to the person's ability to perform the duties of a particular job or position."  775 ILCS 5/1-103(I)(1) (West 2000).  Thus, a 
prima facie
 case of handicap discrimination twice contains the requirement that a plaintiff must have the ability to perform the duties of the job in question.  
Harton
, 301 Ill. App. 3d at 386, 703 N.E.2d at 498.  Further, a plaintiff who cannot, by reason of a physical condition, perform the duties of the job in question even with accommodation is not handicapped under the Act.  
Harton
, 301 Ill. App. 3d at 390, 703 N.E.2d at 501.  An individualized determination of a handicapped person's abilities is required.  
Raintree
, 173 Ill. 2d at 482, 672 N.E.2d at 1142.

Van Campen first contends that the Commission erred in concluding that his condition was related to his ability to perform his job and, thus, he was not covered by the Act.  Specifically, Van Campen challenges many of the Commission's factual findings, including the findings that regular attendance was essential to his position, his position was not amenable to a flexible schedule, he could not regularly attend work and his work performance suffered as a result of his absences.  When reviewing the Commission's factual determinations, we cannot substitute our judgment for that of the Commission and will not disturb its findings unless against the manifest weight of the evidence.  
City of Belvidere
, 181 Ill. 2d at 204, 692 N.E.2d at 302; 
Chicago Housing Authority
, slip op. at 9.  After reviewing the evidence, including the ALJ's credibility determinations, we find that the Commission's factual findings were not against the manifest weight of the evidence, and thus they are deemed 
prima facie
 true and correct.  Therefore, we reject Van Campen's challenges to the Commission's facts.

Our first inquiry is whether Van Campen met the Act's definition of "handicap" and, therefore, invoked the reasonable accommodation requirement.  We agree with the Commission that Van Campen was not handicapped within the definition of the Act, even with accommodation, because his handicap was related to his ability to perform his job duties.  "[A] person's condition is related to his/her ability [to perform his/her job] *** if it is manifested or results in behavior (
e.g.
, absenteeism ***) which fails to meet acceptable standards."  56 Ill. Adm. Code §2500.20(d)(2) (2000).  The ALJ and the Commission found that Van Campen's position required regular attendance and included a work day of 8:30 a.m. to 5 p.m., Monday through Friday.  Hlebasko testified that Van Campen's department did not permit flex-time.  Even if flex-time were allowed, Van Campen's hours would continue to be set and fixed.  Van Campen never requested IBM's traditional flex-time accommodation and, instead, asked for his own version of flex-time which would enable him to work when his medical conditions allowed, with no fixed schedule.  He also testified that he felt "constrained" by having to call or report to work at a fixed time each day.  

Van Campen knew that attendance was a condition of his employment and received numerous warnings from several supervisors and a COE letter detailing requirements necessary to retain his position.  Despite repeated warnings, Van Campen continued to miss work without a medical excuse, arrived late, and failed to contact his supervisor upon his arrival at work.  His performance suffered when he missed client meetings and emergency calls and failed to complete work orders due to his absences.  Van Campen demonstrated that he could not perform an important function of his job, conforming to a regular, fixed work schedule and attendance requirements.  Thus, his absenteeism failed to meet acceptable standards.  We find that the Commission's holdings that Van Campen was not handicapped under the Act and that he failed to make a 
prima facie
 case of handicap discrimination were not clearly erroneous.

Once we have determined that Van Campen was not handicapped, we need not address Van Campen's next argument, that the Commission erred in dismissing his complaint where IBM failed to explore the possibility of reasonable accommodations.  In 
Harton
, the court held that an employer does not commit a 
per se
 violation of the Act by failing to investigate the possibility of an accommodation, even if the employee ultimately could not have performed the job with accommodation.  
Harton
, 301 Ill. App. 3d at 391, 703 N.E.2d at 501.  In so holding, the court distinguished the same cases Van Campen cites here.  In each of those cases, there was evidence that the plaintiff could perform the job in question with accommodation.  
Illinois Department of Corrections v. Illinois Human Rights Comm'n
, 298 Ill. App. 3d 536, 541, 699 N.E.2d 143, 146 (1998) (concluding that a correctional sergeant could perform her job despite her injury by using her left shoulder when firing a shotgun); 
Illinois Bell Telephone Co. v. Human Rights Comm'n
, 190 Ill. App. 3d 1036, 1049, 547 N.E.2d 499, 508 (1989) (holding that a central office technician could perform the duties of her job despite suffering from endometriosis with a reasonable accommodation); 
City of Belleville v. Human Rights Comm'n
, 167 Ill. App. 3d 834, 839, 522 N.E.2d 268, 271 (1988) (finding that a police officer was capable of performing his job notwithstanding his vision impairment); 
Board of Trustees of the University of Illinois v. Human Rights Comm'n
, 138 Ill. App. 3d 71, 75, 485 N.E.2d 33, 36 (1985) (finding evidence that plaintiff could perform the functions of a sheet metal worker despite missing one leg).

In 
Harton
, as in the present case, there was no evidence that plaintiff actually could have performed the job in question even with accommodation.  Here, Van Campen's position required regular attendance and a fixed schedule.  His proposed accommodation of a variable schedule based on his ability to work was not a reasonable accommodation given the fact that such erratic and unpredictable schedules were not allowed by IBM and that Van Campen's department never permitted flex-time.  The evidence showed that Van Campen could not adhere to these requirements even with a reasonable accommodation, and, thus, he could not perform the job in question and was not handicapped under the Act.  Therefore, IBM had no independent duty under the Act to investigate or explore any reasonable accommodation for Van Campen.  Accordingly, we affirm the Commission's decision and need not address Van Campen's remaining arguments or IBM's issues on cross-appeal.

For the foregoing reasons, the decision of the Commission dismissing Van Campen's complaint with prejudice is affirmed.

Affirmed.

HOFFMAN, P.J., and HOFFMAN, J., concur.