EDWARD KELLAN, Plaintiff-Appellee, v. BOARD OF TRUSTEES OF THE FIREMEN'S PENSION FUND OF THE CITY OF PARK RIDGE, Defendant-Appellant.

First District (6th Division) No. 1—88—3730

Opinion filed February 9, 1990.

Paul N. Keller, of Park Ridge, for appellant.

John C. Broihier, of Di Leonardi & Broihier, Ltd., of Des Plaines, for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Edward Kellan, was a civil service firefighter for the City of Park Ridge (City). He filed a claim with the defendant, Board of Trustees of the Firemen's Pension Fund of the City of Park Ridge (Board), for duty-related disability which would entitle him to a pension of 65% of his salary. After a hearing the Board agreed that he was unable to perform the duties of a firefighter but

claimed that his disability was not duty related and that, therefore, he was entitled to a pension of only 50%. The plaintiff filed a complaint for administrative review in the circuit court, which reversed the decision of the Board, holding that the Board's decision was against the manifest weight of the evidence. The defendant contends in this court that the circuit court erred in finding that the Board's decision was against the manifest weight of the evidence and that the plaintiff, as a matter of law, is not entitled to a duty-related disability pension because his disability was allegedly not the result of an act of duty.

The plaintiff joined the Park Ridge fire department in November 1967, at which time he was not experiencing any back, muscle, or other pain. A Park Ridge Civil Service Commission Medical Examination Report dated October 6, 1967, indicated that the plaintiff had no disabilities and was in "very good" physical condition.

During the plaintiff's tenure with the fire department, he suffered several on-the-job injuries:

(1) On August 2, 1974, he lacerated his right hand and pulled muscles in his lower right back while fighting a fire. He received medical treatment.

(2) On March 29, 1975, he lifted a patient into an ambulance and suffered a severe back strain. He received treatment at a hospital and underwent 31 days of physical therapy consisting of diathermy, deep heat, massage, and rest. He lost 41 days from work.

(3) In November 1977, while working as a fireman-paramedic, he injured his right arm and his lower back while removing a patient from an ambulance at a hospital. He received immediate treatment at the hospital and was subsequently examined by a doctor, who took a lower spine X ray and determined that the plaintiff suffered a sprained back in addition to tendonitis in his elbow.

(4) On May 20, 1978, he incurred a muscle strain in his right shoulder while lifting a stretcher; he was treated at a hospital.

(5) On November 12, 1978, while testing fire hydrants, he attempted to loosen the nut on a hydrant with a wrench; the nut shattered, and he fell and injured his shoulder. He received treatment immediately at the hospital and, regularly over the ensuing eight to nine months, for a separated shoulder. He lost 11 months of work as a result of the injury.

(6) On July 2, 1981, he again injured his shoulder while opening a fire hydrant. This injury resulted in an operation to repair a torn biceps tendon. He was off work for a few months, then returned to light duty for approximately 3½ years. He underwent "many differ-

ent forms of physical therapy." After returning to full duty, he resumed firefighting duties but lost his paramedic duties.

(7) On November 23, 1985, he experienced a sharp pain in his lower back after he attempted to stop a stationhouse garage door from coming down on an ambulance in which paramedics were treating a patient. He saw a doctor the following day and received a prescription for muscle relaxants and pain medication; he missed one day of work.

(8) On January 23, 1986, while assigned to a van used for retrieving stray dogs, he shut the door to the van and slipped on a patch of ice, landed on his buttocks and jolted his back. He went to the doctor for lower back pain and received a pain medication and a muscle relaxant.

(9) On June 10, 1986, he was riding in the passenger seat of a fire engine that hit a pothole; he hit his head on the ceiling and was "slammed back down in the seat again." He was not wearing his helmet since he did not fit in the cab while wearing one. He saw a doctor for back and neck pains, and he received pain medication and a muscle relaxant and missed one day of work. The driver of the fire engine, James Vogner, testified that hitting the pothole caused "one heck of a bump." Another fireman who was riding in the fire engine, August Schramel, testified that "[w]e hit a good hole and we both flew up." He said that they got "a good jolt out of it."

(10) On September 16, 1986, while working on light duty, the plaintiff was seated at a table in the station house. He testified that the following occurred as he prepared to get up to go check buildings with the fire prevention officer.

> "I was sitting there and I grabbed my books and I turned to the right to get out of the chair and there was an extremely sharp pain in my low back. I didn't get more than an inch or two off the chair, and I guess I yelled or something. I don't recall exactly what happened.
>
> I sat down and [the fire prevention officer] said, 'What's the matter.' I said, 'I've got a pain in my back. I can't get up.' He just sat there for a minute, and I said, 'I'm going to try it again,' and I tried. There was just no way I could get out of the chair at that moment."

The fire-prevention officer, Richard Arthur, testified that as the plaintiff tried to get up from the chair he "just stopped halfway and winced with pain and said that his back was bothering him." Arthur also said that as the plaintiff was "getting up he had a real sharp pain in his back and he displayed pain in his face." Ernest Paul, the

firefighter who drove the plaintiff to the chiropractor at that time, testified that the plaintiff was sitting in the office complaining of pain. He said that the plaintiff "look[ed] like he was in a good amount of pain."

The plaintiff was driven to the chiropractor, who applied ice packs and electric current and massaged the plaintiff's back. He sent the plaintiff home with instructions to apply alternately heat and ice. The next evening the plaintiff saw Dr. Per Freitag, who discovered that the plaintiff had herniated disks in his neck and lower back. The plaintiff never returned to work after September 16, 1986.

The plaintiff testified that he had never sustained a back or spine injury while he was off duty. His only back injuries were suffered while at work. His only hobby is fishing. He had very little off-duty employment while working for the fire department.

After the plaintiff filed a claim for disability, he was required by the Board to submit to examinations by Dr. Richard Sturm, Dr. Herbert Loseff and Dr. David Spencer. Dr. Sturm and Dr. Loseff gave the Board reports which were favorable to the plaintiff. Apparently Dr. Spencer gave a report which was not favorable to him. A trustee of the Board, Curt Edelmann, sent a letter to Dr. Sturm and Dr. Loseff which is not part of the record. References to the letter by Dr. Sturm and Dr. Loseff and other matters in the record indicate to us that Edelmann took exception to their reports and made allegations of fact, apparently based on his personal knowledge, which the doctors were to consider. He did not send a similar letter to Dr. Spencer. Both Sturm and Loseff subsequently sent second reports to the Board which we will discuss later. Dr. Freitag, the plaintiff's treating physician, and Dr. Sturm testified for the plaintiff. Dr. Loseff's reports were introduced by the plaintiff.

Dr. Freitag had been the plaintiff's treating physician since September 17, 1986. It was he who first discovered that the plaintiff had herniated disks in his lower back and one in his neck. It was his opinion, based on the medical history that had been provided by the plaintiff, the physical examination and objective testing, that the plaintiff was unable to carry on the full and normal duties of a firefighter. Freitag said that sitting is very difficult for the plaintiff and is "about the worst position he can be in." He said that any one or a combination of the plaintiff's injuries could have resulted in the herniation in the cervical spine, which is in the neck, as well as the herniation in the lumbar spine, which is in the lower back. Freitag also testified that it was his opinion that the injuries to the spine

were duty related, "based on the history as of the date the plaintiff was injured and [his] being on the job when these injuries took place."

Dr. Sturm, who is board certified in internal medicine and occupational medicine, examined the plaintiff for a disability evaluation on October 9, 1987. As a result of the examination he prepared two letters, dated October 12, 1987, and November 30, 1987. He also discovered that the plaintiff had two herniated disks in his back and one in his neck. He testified that the plaintiff had informed him of six incidents in which he suffered injury. He further testified as follows:

"In the nature of scientific proof, we would like to be perhaps 95 percent sure or 99 percent sure that something is true before we assert that it's a scientific truth.

I believe the kind of truth you're asking me about is a reasonable degree of medical certainty which in my understanding is a 51-percent chance or greater that events are causally related.

If this is the case, reviewing [the plaintiff's] history of these injuries, it did seem to me that there was greater than a 51-percent chance that these injuries as described played some part or even a major part in his herniated disks.

\* \* \*

I think it's more likely than not that these incidents played a major role in causing or in making symptomatic his herniated disks.

\* \* \*

The injuries that were cited as on-the-job injuries are the only forceful traumatic injuries that are recounted in [the plaintiff's] medical history. No other injuries were discovered that would contribute materially to [the plaintiff's] problem.

But based on the number of injuries presented by him as work-related injuries \* \* \* and the medical history, I felt it was more likely than not that these injuries played a major cause in his herniated nucleus pulposus."

In his first report to the Board, Sturm expressed the opinion that the herniated disks were caused by injuries to the plaintiff while he was on duty. After receiving the letter from Edelmann questioning Sturm's conclusion, Sturm submitted a second report adhering to his opinion that the plaintiff's on-duty injuries caused the disk herniations.

Sturm also said that it is not possible to determine the cause of

a herniated disk without reference to medical history; that medical history is very important to a diagnosis and that good medical practice requires taking such a history.

In Dr. Loseff's first letter, dated November 13, 1987, he said that the plaintiff had "several job-related injuries"; that he diagnosed the plaintiff as having herniated disks and that he "believe[d] the on-the-job incidents were the cause of this patient's problems."

After he received Edelmann's letter, Loseff changed his opinion. The plaintiff's lawyer then sent a letter to Loseff in which the attorney sought to answer the allegations of fact Edelmann made in his letter. The plaintiff's attorney expressed the view that Dr. Loseff had changed his opinion because of the "alleged facts" contained in Edelmann's letter and expressed disagreement with certain statements of fact made by Edelmann. He included in the letter both of Dr. Sturm's reports, and he asked that Loseff again reconsider his opinion based on Dr. Sturm's opinion and the response to Edelmann's factual allegations.

Loseff wrote a letter to the plaintiff's attorney which is, in part, as follows:

"What seems to be an issue here is whether or not his job caused all of his problem. As you know, much of this information was not available to me on the basis of my initial examination. If what you say regarding his injuries can be substantiated, I believe that the patient probably has a problem with his low back and his disabilities which is work-related. However, because there is such a difference of opinion between you and Mr. Edelmann's statements, I cannot verify which is fact and which is fiction. I will have to state that I only can go upon what the patient told me.

In summary, if what you describe in your letter of December 18th is true, then I would say that this patient has a work-related injury."

Dr. David Spencer, an associate professor of orthopedic surgery and a practicing orthopedic surgeon, testified for the defendant. Based on his findings, he concluded that the plaintiff had degeneration of the disks in his back and neck, a condition very characteristically seen in 50-year-old individuals, and that the plaintiff should not continue to work as a fireman. At the time he submitted his report to the Board he was aware of only the incident on September 16, 1986, when the plaintiff attempted to arise from his chair.

Since we conclude that Dr. Spencer's testimony removes any doubt of the propriety of the order of the circuit court, we set out

the pertinent portions verbatim:

"A. However, I did not feel that there was any evidence in the history that he had given me that there was any single significant on-the-job accident that could be attributed as the *primary cause* for any of these disk herniations.

Q. The last sentence of your letter indicated that the on-the-job incidents *merely aggravated pre-existing or underlying conditions*; is that correct?

A. Right.

Q. Now, doctor, I'd like to ask you to explain that for the Board if you would, please. What is or was the pre-existing condition that you're referring to?

A. Age-related degeneration of the intervertebral disks.

\* \* \*

A. It's my opinion that in essence, Mr. Kellan's condition is the result of a lifetime of accumulated effects and that the episodes that I mention, the four specific episodes [of injuries on the job] *indeed aggravated that. I'm not contesting that he didn't have pain after those episodes. I'm sure he did. The fundamental reason he had pain was not because he didn't have an acute injury at that time but that he aggravated a weak back,* for example, if I can use that kind of familiar term and that that weakness or degeneration was the result of a life-long activity of hard work and a little bit of bad luck in the sense that he had disks that had a propensity to deteriorate and bulge like this." (Emphasis added.)

On cross-examination the following exchange occurred:

"Q. Now, you're now aware of the fact that there were more incidents involving the spine than you initially were aware of. \* \* \*

Now, again, when you talk about a degenerated disk, is it possible that those series of incidents could have caused and started the degeneration of the disks that you noticed?

A. Yes.

Q. Is it also not true that once that process commenced, that any one of those particular incidents may have been the straw that broke the camel's back; is that correct?

A. Possible."

Later, the doctor testified that he was convinced that every single one of the injuries to which the plaintiff had testified contributed to his back problem.

On redirect examination he was asked whether the incidents

were the "sole cause" of the plaintiff's present condition. He answered that the plaintiff did not have one specific job-related trauma that could be held responsible. He said he was convinced that the degeneration in the plaintiff's spine is "more severe than if he had had a different line of work." In response to a question by a trustee he said that he was convinced that the plaintiff's "problem is partially a result of his job and partially a result of misfortune, bad luck of having the back that he has."

It is our judgment that Dr. Spencer's testimony standing alone would require an award of duty disability to the plaintiff. It is also our judgment that the Board was not aware of the applicable law as evidenced by the remarks during the Board's deliberation. Trustee Edelmann, who appears to have taken the lead role in questioning the plaintiff's claim, summed up the evidence at the beginning of the Board's deliberation. In that summation he said that "[i]t's probably true that firefighting played a role in the applicant's disability." He concluded as follows:

> "I think the facts as presented in this hearing point out that the applicant *because of both on-the-job injuries* and off-the-job activities has worn his body out causing a disk herniation which has developed into debilitating symptoms; that *since acts of duty alone cannot be established as the cause of the disability or even a major factor causing the disability,* I think that the Board should award a 50-percent disability." (Emphasis added.)

■■ The statute in issue is section 4—110 of the firefighters' pension fund act (Ill. Rev. Stat. 1987, ch. 108½, par. 4—110) and provides in part as follows:

> "If a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found *** to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension, the firefighter shall be entitled to a disability pension of 65% of the monthly salary attached to the rank held by him or her in the fire department at the date he or she is removed from the municipality's fire department payroll."

■■ In *Mitsuuchi v. City of Chicago* (1988), 125 Ill. 2d 489, 532 N.E.2d 830, the supreme court pointed out that the statute governing disability, pension and death benefits for police officers serves purposes equivalent to workers' compensation and that the system

created for the compensation of injured officers under the Illinois Pension Code (Ill. Rev. Stat. 1981, ch. 108½, pars. 22—306, 22—307) is analogous to that established by the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, pars. 138.1 through 138.30). Because of similarity of language and because the Pension Code was enacted to provide policemen and firemen with benefits similar to those provided employees under the Workers' Compensation Act, the standards developed under that act are applicable. *O'Donnell v. City of Chicago* (1984), 126 Ill. App. 3d 548, 467 N.E.2d 971.

■ In *Olson v. City of Wheaton Police Pension Board* (1987), 153 Ill. App. 3d 595, 505 N.E.2d 1387, the court held that rules governing police and firemen's pensions must be liberally construed in favor of the applicant and that the pension statute did not bar an award of a line-of-duty disability pension based upon the aggravation of a preexisting physical condition. In support of that conclusion the court stated as follows:

> "We are supported in our decision by cases in which our supreme court determined that evidence of a preexisting physical disability will not bar an award of compensation for a job-related injury caused by the 'stress of his usual labor.' [Citations.] Although these cases arose under the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*), we consider that the principle applies to the facts of the present case." 153 Ill. App. 3d at 598.

The defendant makes three arguments against a holding that the evidence proves aggravation of a preexisting condition. First, it says that there is no evidence to support such a finding. Dr. Spencer's testimony clearly refutes that position. Second, the defendant says that the trial judge "gratuitously announced at the conclusion of his oral opinion that he concurred" in the *Olson* opinion. It is true that the judge had already ruled but then added that he wanted his agreement with the "dicta" of the *Olson* court made part of the record for the benefit of the appellate court.

The practice of a judge explaining the reason for his ruling is to be encouraged, not criticized. Courts of review have often expressed a wish that the trial judge had, in fact, given the reasons for his rulings. In addition, the judge's remarks should not have been a surprise to the defendant. It was not the first time that the *Olson* case was mentioned; the defendant's attorney had cited *Olson* in his brief.

Before oral argument began in the circuit court, it was the judge who raised the applicability of the rule concerning aggravation

of a preexisting condition. The defendant's attorney pointed out that that theory had not been presented to the Board. He added that the holding of the *Olson* case concerning aggravation of a preexisting condition was "dicta," although "the [*Olson* opinion] did give some background on that issue." It is clear to us that the judge had read the defendant's brief, was aware of the expression of the law in *Olson* and correctly agreed with it whether that expression was *obiter dictum* or not.

A discussion of the third reason advanced by the defendant to dissuade us from considering the issue—that the plaintiff did not raise the theory at the hearing before the Board—requires a discussion of other arguments made by the plaintiff in the circuit court. He argued first that the attorney for the Board was also the attorney for the City and had been improperly substituted for the Board's regular counsel. The plaintiff also argued that Edelmann was not an impartial trustee because Edelmann had sent letters to Dr. Sturm and Dr. Loseff questioning their original conclusions and because Edelmann had told the plaintiff's attorney at the end of the first day of the hearing that Edelmann and the other members of the Board did not feel they could grant the plaintiff a duty disability. (Edelmann admitted that conversation.)

During the argument before the judge, the attorney for the Board sought to dispel any suggestion of impropriety because, he argued, the proceedings were not adversarial:

"I think, Your Honor, that a careful reading of the record in this case would indicate that notwithstanding the fact that the chairman of the Board of Trustees of the Pension Fund acted pursuant to my advice and recommendations, nevertheless, all evidentiary matters, it was the Board itself through its chairman, the president, Mr. Paulson, who made all rulings on all evidentiary objections.

I'd also like to point out to the court that this entire proceeding was not structured and not presented as a prosecution. There was no—*no attorney acting against the interest of the applicant, Mr. Kellan.* This was—this whole proceeding was carried out as an investigatory process.

Acting at the discretion of the Board, I assisted the Board in questioning the witnesses. I assisted the Board to determine what witnesses ought to be called, and I assisted the Board by taking the lead in questioning some of those witnesses, not all of them. Some of the witnesses were questioned directly by members of the Board." (Emphasis added.)

Accepting the characterization of the administrative proceeding given in the circuit court by the attorney for the Board (and we concede that the Board participated in the questioning of witnesses to an unusual degree), and recognizing that no pleading at the Board was required other than the bare claim filed by the plaintiff, it would be unfair to say now that the plaintiff had waived the right to argue in the circuit court that the evidence established the aggravation of a preexisting condition.

 The rule that matters not raised in the trial court may not be raised for the first time in a court of review is a limitation on the parties and not on the court, which has the responsibility of reaching a just decision. (*In re Marriage of Bennett* (1985), 131 Ill. App. 3d 1050, 476 N.E.2d 1297.) There is no reason that the same limitation of the rule should not apply in cases before a circuit judge on administrative review.

Moreover, we are not convinced that the question was not adequately presented before the Board. In his summation, the attorney for the plaintiff discussed the testimony of Dr. Spencer as follows:

"He could not tell you specifically what caused that degeneration. He said it could be caused by genetics. But then he testified that in Mr. Kellan's case he doesn't know what caused it. He certainly doesn't know if it's genetics. He testified to that. He did testify that the trauma that he sustained in the course of those injuries and those accidents certainly were contributing factors to his current back problem. He wouldn't testify that they were *the sole cause, the only cause,* but he did testify that after being aware of the number of incidents that in fact they could significantly contribute to the degenerative situation that his spine was in." (Emphasis added.)

 In substance, the plaintiff's attorney argued that the plaintiff need not prove that the injuries he received on duty were the sole cause of his back problem; that it was sufficient to show that the injuries contributed to the problem. We see no reasonable distinction between an argument that an act contributed to one's condition and an argument that the act aggravated a preexisting condition. The argument of the plaintiff's attorney was a correct statement of the law. (*Republic Steel Corp. v. Industrial Comm'n* (1962), 26 Ill. 2d 32, 185 N.E.2d 877.) That argument was expressly rejected by Edelmann in the deliberations and improperly so. For these reasons, we judge that the issue was properly before the circuit judge and he properly based his decision on the ground that the

evidence established aggravation of a preexisting condition.

■ Even if we were to assume that the question had not been properly preserved, we would affirm the judge on the additional ground that the decision of the Board was against the manifest weight of the evidence. It would serve no purpose to repeat all the medical testimony. It is enough to say that Dr. Spencer's testimony did not contradict the testimony of the other doctors to the extent that a material question of fact existed. The defendant's attorney made the somewhat surprising statement in oral argument in this court that the Board disregarded Dr. Spencer's cross-examination testimony and relied on his direct examination testimony. We do not agree that they had the right to disregard testimony that supported the plaintiff's position.

There is one other aspect of the defendant's argument, however, which should be addressed. Throughout its argument in the circuit court and in this court runs a common theme: The plaintiff lied about his injuries, and the Board did not believe him. The record does not support either aspect of that argument. Over objection by his attorney, the plaintiff was required to give his opinion as to the cause of the herniated disks. (The plaintiff's attorney correctly argued that the plaintiff was not qualified to give such an opinion.) The plaintiff particularly was required to give his opinion as to whether the incident of September 16, when he rose from the chair, caused the herniated disk. He said that in his opinion it did. The defendant's attorney now takes the position that the Board's rejection of the plaintiff's expressions of opinion shows that the Board concluded that he lied. This is not only an unfair argument, but it is not borne out by the record. There is nothing in the deliberations of the Board from which a conclusion could be drawn that the Board felt that the plaintiff had not told the truth. At one point in the deliberations one of the trustees pointed out that the plaintiff's lawyer said that the plaintiff "does not know what caused the herniated disks." Another trustee said that he would like to award the plaintiff the extra money because he was sure "in many other ways [the plaintiff] may have deserved it." That trustee also said that he had the "greatest admiration of the testimony of everybody involved." Whether that remark was directed to the testimony of only the doctors, we cannot tell. But it indicates an opportunity was presented to the Board to express an opinion of the credibility of any other witness; it did not do so. A reading of the entire transcript of the deliberations leads to no other conclusion but that the Board decided the case under a misunderstanding of the proper principle of law.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, P.J., and McNAMARA, J., concur.