CAROL L. WORTH, Plaintiff-Appellee, v. THE BOARD OF TRUSTEES OF THE POLICE PENSION FUND OF THE VILLAGE OF ORLAND PARK *et al.*, Defendants-Appellants.

First District (3rd Division) No. 1—91—1797

Opinion filed May 20, 1992.

Puchalski, Keenan & Reimer, of Chicago, for appellants.

LeRoy W. Gudgeon, of Chicago, for appellee.

JUSTICE CERDA delivered the opinion of the court:
Defendants, the Board of Trustees of the Police Pension Fund of the Village of Orland Park, Illinois (the Board), Board president Charles R. Cassata, and trustees George G. Gilbert, Ronald Noteboom, Daniel Nash, and Theodore Ludes, appeal from the reversal of the Board's decision denying plaintiff, Carol L. Worth, a line of duty disability pension.

Plaintiff's complaint for administrative relief alleged the following. Plaintiff was appointed a police officer of the Village of Orland Park on or about July 7, 1987. She applied for a line of duty disability pension based on injuries resulting from the performance of an act of duty on January 30, 1988. After hearings, the Board issued a written decision on December 17, 1989, granting plaintiff a non-duty disability pension. Plaintiff sought a reversal of the decision on the basis that she was entitled to a line of duty disability pension as provided in section 3—114.1 of the Illinois Pension Code (Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.1) (the Code). We affirm the reversal of the Board's decision.

Plaintiff testified at a Board hearing to the following about her left knee injury. She had no preexisting injury to her left knee prior to working as a police officer. The first incident of problems with her knee was when she was sitting at the police academy with one leg underneath her. She felt a pain, and when she sat back down again, her knee cracked. The next morning she was in a car on her way to the

academy when her knee locked. She could not straighten it out or bend it up. She was in extreme pain and was taken to the hospital.

On January 30, 1988, plaintiff was on duty in a squad car driven by Officer Pila on the way to the police station at the end of their shift. While stopped at a red light, their car was struck by another car. Both her knees hit the dashboard, and the left knee hit the radio console. Although her knees hurt, she exited the car to check for injuries of the other people involved in the accident.

On February 20, 1988, plaintiff was on duty doing routine patrol when she slipped and twisted her left knee. She did not fall, but she felt pain.

Plaintiff further testified that her doctor subsequently recommended arthroscopic surgery to determine whether there was any torn cartilage in the left knee. After surgery in March 1988, she developed an infection in the knee, and she required more operations. Later, it was determined that she had reflect sympathetic dystrophy, and she was told that she would never be able to bend her knee again.

Orland Park police officer Michael Pila testified that he did not see whether plaintiff struck her knees on the dashboard in the January 30, 1988, accident.

Dr. Leon Malachinski testified that plaintiff had a greatly diminished range of motion in her left knee. She could not perform the regular duties of a police officer or light duty police work as result of the knee's condition. It would be extremely difficult for her to perform virtually any type of work.

Dr. Arthur E. Ostergard testified that he was an occupational health consultant who examined plaintiff on the Board's request in order to issue an opinion regarding her ability to perform the functions of a police officer. Another doctor had referred to a softening of the bone of plaintiff's left knee and an abnormality with her left lateral meniscus. The softening could have been caused by the impact on the dashboard. An operation was performed on her knee, and an infection in the knee called sepsis developed afterwards. There was subsequent scarring with decreased range of motion and function of the knee. Plaintiff currently has adhesions, scarring, the residual of a septic joint, and difficulty with the range of motion of that joint. Plaintiff could not perform the duties of a police officer.

Dr. James Charles Murray, an orthopedic surgeon, testified that he reviewed the records of plaintiff's orthopedic physician and that he examined plaintiff. Plaintiff's infection was the type in which bacteria released enzymes that dissolved knee cartilage. When he examined

plaintiff, she had a knee replacement, which was the only viable option for semi-normal function of the knee. His opinion was that plaintiff's cartilage had softened and was probably fractured and that the outside cartilage on her knee was hypermobile instead of immobile. Her injury was one that commonly resulted from collisions with dashboards. His opinion within a reasonable degree of medical certainty was that plaintiff sustained her injury from the collision with the dashboard because she was asymptomatic prior to the collision, because the pain began after the collision, and because the mechanism by which she sustained the injury coincided with the medical findings. It was possible that the injury occurred from some other incident in which her knee hit an object. Her knee would never be normal, and she was unable to perform the normal duties of a police officer.

The Board found the following in a written decision. Plaintiff was unable to perform her police officer duties. There were numerous incidents of asserted injuries, but there was a lack of corroboration of much of plaintiff's testimony and inconsistencies in plaintiff's statements. Plaintiff's claim that she struck her knee on the dashboard and on the radio during the accident was unbelievable. Plaintiff's claim of injury on February 20, 1988, was not credible. Plaintiff failed to prove when the injury precipitating her surgery occurred, but anyway none of the events were related to the requirements of her duties as a police officer: (1) sitting in a chair was not unique to police service; (2) even if she were on duty when driving to the Chicago Police Academy, she was not performing any police functions; and (3) on January 30, 1988, the squad car was stopped at a red light, and she was not performing any task other than sitting when the car was struck. Her disability was not the result of a duty-related injury. It appeared more likely that plaintiff's disability was the result of a complication from surgery than the result of her knee injuries. There was no evidence that the surgery was necessary. Surgical complications were not unique to police officers.

The trial court reversed the Board in a memorandum opinion that held that the causes of plaintiff's disability were work related and that she was entitled to a line of duty pension.

Defendants argue on appeal that: (1) the Board's decision to award a non-duty disability pension was not against the manifest weight of the evidence or legally erroneous; (2) the Board's finding that plaintiff's injuries were not incurred in the performance of an act of duty was not legally erroneous; and (3) the Board's finding that plaintiff's disability was caused by complications from surgery was not against the manifest weight of the evidence. Specifically, defend-

ants argue that plaintiff's injuries were not incurred in the performance of an act of duty because: (1) the mere fact that a police officer is employed and in uniform when an injury occurs does not automatically entitle her to a duty disability pension; (2) plaintiff did not show a causal connection between her injury and the performance of a specific act of duty involving a special risk not ordinarily assumed by other individuals; (3) the board did not find plaintiff's claim of slipping on ice credible; and (4) plaintiff's disability was the result of complications from surgery and not from injuries suffered as a result of performance of her duties as a police officer.

■ On appeal, a reviewing court will only examine the administrative agency's findings of fact to determine if they are against the manifest weight of the evidence. (*Wall v. Police Pension Board* (1988), 178 Ill. App. 3d 438, 442-43, 533 N.E.2d 458.) The findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct. (Ill. Rev. Stat. 1989, ch. 110, par. 3—110.) A reviewing court is not bound to give the same deference to an administrative agency's conclusions of law and statutory construction as would be given factual findings, but it must exercise independent review and judgment. *Illinois Bell Telephone Co. v. Human Rights Comm'n* (1989), 190 Ill. App. 3d 1036, 1046, 547 N.E.2d 499, 506.

■ Plaintiff sought a line of duty disability pension pursuant to section 3—114.1 of Article 3 of the Code:

> "If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension of 65% of the salary attached to the rank on the police force held by the officer at the date of suspension of duty or retirement." (Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.1.)

Article 3, which governs the police pension fund for municipalities of 500,000 and under in population, also provides for an outside the line of duty disability pension:

> "A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% of the salary attached to the officer's rank on the

police force at the date of suspension of duty or retirement."
(Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.2.)

In contrast to Article 5 of the Code (Ill. Rev. Stat. 1989, ch. 108½, par. 5—113 (definition of act of duty)), which governs the police pension fund for cities of more than 500,000 in population, Article 3 does not contain a definition of act of duty. But it does state:

> "A police officer shall be considered 'on duty', while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality." Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.1.

The Board relies upon *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund* (1986), 114 Ill. 2d 518, 508 N.E.2d 718, in which a police officer sought a duty disability pursuant to Article 5 of the Code (Ill. Rev. Stat. 1989, ch. 108½, par. 5—154). While the officer was at his assigned post at an intersection for traffic control, a person called to him for assistance regarding a traffic accident. In the process of crossing the intersection to investigate and respond, the officer slipped on wet pavement and fell. Defendant argued that the act of walking across a street was an act assumed by any citizen and that therefore the officer was not entitled to a duty disability pension. "Act of duty" was defined in Article 5 in relevant part as a "police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life." (Ill. Rev. Stat. 1989, ch. 108½, par. 5—113.) The court held that special risks encompassed more than only inherently dangerous activities and that, although police perform acts which are similar to those involved in many civilian occupations, the crux was the capacity in which the officer was acting. (*Johnson*, 114 Ill. 2d at 521-22.) The court also held that the officer there was performing the act of duty of responding to a citizen's call for assistance so that he was entitled to a duty disability pension. *Johnson*, 114 Ill. 2d at 522.

Unlike *Johnson*, section 3—114.1 of Article 3 of the Code is involved in plaintiff's case. That section was at issue in *Olson v. City of Wheaton Police Pension Board* (1987), 153 Ill. App. 3d 595, 505 N.E.2d 1387, which was cited by defendants. In *Olson*, a police sergeant suffered migraine headaches from job stress, which was attributed to differences in management style with his superior, to the bringing of charges against him, and to his assignment as a patrol officer. The court noted that civilians regularly suffered stress in their employment resulting from conflicts with their superiors, from complaints filed against them in connection with their jobs, and from the

assignment of tasks which they deemed unsuitable for their position. (*Olson*, 153 Ill. App. 3d at 599.) The court cited section 5—113 and held that the officer's stress did not result from his performance of an act of duty. *Olson*, 153 Ill. App. 3d at 599-60.

Because the case arose under section 3—114.1, we believe the *Olson* court improperly consulted the Article 5 definition of act of duty because the Article 5 definition (Ill. Rev. Stat. 1989, ch. 108½, par. 5—113) applies only to cases brought under Article 5. (See Ill. Rev. Stat. 1989, ch. 108½, par. 5—102.) The terms used in Article 5 have the meanings ascribed to them in the definitional sections 5—103 through 5—120. (Ill. Rev. Stat. 1989, ch. 108½, par. 5—102.) Article 5 cases applying the special risk component of the Article 5 definition therefore are not relevant to the instant case.

■ The first issue is how plaintiff became disabled. The manifest weight of the evidence was that plaintiff suffered her injury when her knees hit the dashboard in the automobile collision. Dr. Murray testified that plaintiff's injury was a common injury commonly caused by collisions with dashboards and that, based on the medical evidence, her injury was in fact caused by the dashboard collision. In addition, the orthopedic surgeon testified that the injury to plaintiff's knee cartilage resulted from the collision with the dashboard. Although Dr. Murray also testified that it was possible that plaintiff's injury occurred from some other incident, there was no evidence of another collision with the knee.

The second issue is whether plaintiff was performing an act of duty within the meaning of section 3—114.1. Due to the absence of a definition in Article 3, we must construe the phrase according to its ordinary meaning. *City of East Peoria v. Group Five Development Co.* (1981), 87 Ill. 2d 42, 46, 429 N.E.2d 492, 494.

Plaintiff testified that she was on duty when she was riding in the squad car at the time of the collision. No special risk was explicitly required under Article 3. Therefore, the squad car in which plaintiff was riding did not have to be in pursuit of criminals or engaged in making a traffic stop for plaintiff to have been performing an act of duty, as defendants argue. Even though plaintiff and her partner were returning to the police station towards the end of their shift, plaintiff was still on assignment and was ready to perform an act of duty. Indeed, after the collision, she checked for injuries of the other persons involved. The Board erred in concluding that plaintiff was not performing an act of duty at the time of the collision.

The third issue is whether the injuries suffered after surgery "resulted" from her performance of an act of duty, within the meaning of

the Code. Plaintiff's arthroscopic surgery was done to determine the extent of her injury, and further operations were necessitated by the infection occurring after the first operation. The Board erred in finding that surgery was unnecessary. We hold that plaintiff's disability resulted from her performance of an act of duty because the infection resulted from the treatment of her collision injury. We hold that plaintiff is entitled to a line of duty disability pension.

The judgment of the trial court is affirmed.

Affirmed.

RIZZI and TULLY, JJ., concur.