DONNIE ROBBINS, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE CARBONDALE POLICE PENSION FUND OF THE CITY OF CARBONDALE, Defendant-Appellee.

Fifth District   No. 5—95—0706

Opinion filed September 24, 1996.

Womick & Associates, Chartered, of Carbondale, for appellant.

Wolff & Jones, of Murphysboro, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:
Police officer Donnie Robbins petitioned the Carbondale Police

Pension Fund for a disability pension benefit, pursuant to section 3—114.2 of the Illinois Pension Code (Code) (40 ILCS 5/3—114.2 (West 1994)). On January 27, 1994, Robbins amended his petition, adding a claim for line-of-duty pension benefits under section 3—114.1 of the Code (40 ILCS 5/3—114.1 (West 1994)). The Police Pension Fund Board of Trustees (Board) denied Robbins' line-of-duty pension benefit but found that Robbins was entitled to a not-on-duty pension. The circuit court affirmed the Board's decision. Robbins appeals from the decision denying line-of-duty pension benefits. The question presented to us is whether it is necessary for an applicant for a line-of-duty pension to establish that the *sole* cause of his disability was an on-duty accident. We hold that it is not and therefore reverse.

■ Agency findings on questions of fact are *prima facie* true and correct. *Parisi v. Jenkins*, 236 Ill. App. 3d 42, 47, 603 N.E.2d 566, 569-70 (1992). A court's function on administrative review is limited to determining whether the factual conclusions of the agency were against the manifest weight of the evidence. *Jagielnik v. Board of Trustees of the Police Pension Fund*, 271 Ill. App. 3d 869, 875, 649 N.E.2d 527, 530 (1995). An agency interpretation of the statutes the agency is empowered to administer should only be overturned if it is clearly erroneous. *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108, 110, 596 N.E.2d 795, 797 (1992).

At the hearing before the Board, Robbins, who is 47 years old, testified that he began working for the Carbondale police department in 1970. During the first nine years of his employment he worked as a patrol officer. In 1979, he became an evidence custodian and continued in that position until the fall of 1988, when he was reassigned to patrol duty. Robbins testified that in 1989 he was having difficulty keeping abreast of the reports he had to write. In fact, his superior criticized his performance, both because of the untimeliness of the reports and because of alleged mistakes in them. Robbins testified that the criticism caused him stress. Robbins testified that he also became stressed because the other officers he worked with were younger and, in his opinion, better trained.

Robbins testified that in addition to these perceived stress-inducing factors, he was particularly affected by one incident. On New Year's Day 1990, Robbins responded to a domestic violence call and encountered a husband armed with a shotgun. The incident ended when, in the presence of Robbins, the individual turned the gun on himself and committed suicide by shooting himself in the face. Robbins continued working patrol duty until his hand was injured in April of 1992. Robbins was off work from the hand injury until October of 1992. Robbins had been back at work for only two

days when the police chief instructed him to have a psychological evaluation performed by Dr. Eric Ostrov. The exam was ordered because the chief believed that Robbins was having suicidal thoughts. Robbins denied having suicidal thoughts but testified that the very thought of returning to patrol duty upsets him. He believes that the stress he suffered and the problems resulting from it are directly related to his work as a police officer. Robbins was also questioned about his alcohol consumption. Robbins testified that he has consumed alcohol socially over the past 15 to 20 years. He believes that he is capable of handling his alcohol consumption and has never undergone treatment or therapy for alcohol abuse.

Psychologist Dr. Eric Ostrov testified that he examined Robbins in 1992 at the request of Police Chief Don Strom. Ostrov testified that both the interview and the psychological testing indicated that Robbins was emotionally distraught, depressed, and possibly suicidal. Robbins was also consuming a great deal of alcohol at that time, and he was potentially violent. Robbins told Ostrov that he had a poor appetite, was moody, was experiencing sleeplessness, and was having difficulty performing routine tasks. Robbins related that he and his current wife have had marital strife in the past. Robbins also indicated that he was having suicidal thoughts and believed that everyone, including himself, would be better off if he were dead.

Ostrov testified that there is a connection between Robbins' depression and his employment as a police officer. He believed that Robbins was very comfortable for eight years working as an evidence custodian, but when he was put back on the street, he felt inadequate and too old and feared the dangers of his job. Ostrov testified that Robbins told him of the incident involving the man who committed suicide in front of Robbins during Robbins' investigation of a domestic dispute. Ostrov related that based upon his examination of Robbins in October of 1992, he believed that Robbins probably could not carry out his duties because of his fears and that his fears were related to his work. He testified that Robbins could be dangerous because he might not be capable of backing up a fellow police officer.

Dr. Ostrov examined Robbins again one year after his initial exam and found dramatic improvement. Robbins was not nearly as depressed and his mood was positive. His hand injury had healed and his marriage was going well. Ostrov testified that based on this examination, he would have recommended that Robbins return to the police department, but only in a non-weapon-carrying capacity. After his second examination, Ostrov wrote, "I recommend that Mr. Robbins be returned to active duty only if accommodation can be made to his susceptibility to the stress of routine police work while on

patrol or working on the streets." When asked whether Robbins' problem was causally connected to his work as a police officer, Ostrov testified: "I have to say yes if by causally is meant any connection. I would have to say no if what is meant is more specific connection [*sic*] to a specific act that he took as a police officer." Ostrov opined that there was not any one specific on-duty incident that caused the problems from which Robbins currently suffers, but that Robbins' fear of being on the street played a role in his emotional decompensation and inability to work.

Dr. David Gilliam examined Donnie Robbins in March of 1994, and he found that Robbins' problems with depression and alcohol abuse were directly caused by his work. Gilliam opined that Robbins' reassignment to patrol duty was particularly important in leading to the development of his depression and alcohol abuse.

Psychologist James Peterson also evaluated Robbins. Peterson concluded that Robbins consumed alcohol quite heavily during a period in his life when he was distressed by work and depressed and separated from his wife. Peterson found that this dependency on alcohol was directly stress related and is not indicative of any type of long-term chronic drinking and/or alcohol dependency. Dr. Peterson also found that once Robbins learned stress-reduction techniques and coping strategies he could perhaps return to work on active duty with the public.

Dr. Michael Althoff conducted a psychological exam on March 1, 1994, to provide information regarding Robbins' current psychological functioning. Althoff found that Robbins' previous impairment appeared to be a result of his performance of the duties of a police officer. Althoff opined that the noteworthy signs and symptoms of depression, alcohol abuse, and marital conflict that were previously noted were no longer present. Althoff found that if Robbins were to return to his duties as a police officer working the streets, his psychological status would deteriorate and some of the problems that were previously noted would return.

In its final decision, the Board concluded:

> "Upon the entire record of the case there is insufficient credible evidence to sustain the burden of proof required to be met by the applicant *that the* disabling *injury was the result of and incurred from or in the performance of his duty.*" (Emphasis added.)

Robbins contends that it is clear that the Board's decision was based on its conclusion that his illness was not caused solely by a line-of-duty incident. This, Robbins argues, is an incorrect application of the law. The Board contends that in order for Robbins to recover a line-of-duty pension, the *sole* cause of his disability must have been incurred in the line of duty.

■ The issue we are deciding is not whether the Board's result is against the manifest weight of evidence, but whether the Board and the circuit court properly applied the law on the question of the causation of the plaintiff's disability. It is undisputed that Robbins is mentally disabled from service. Turning to the question of law, we first examine the language of the statute:

> "Disability pension—Line of duty. If a police officer as the result of sickness, accident or injury *incurred in or resulting from the performance of an act of duty,* is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension of 65% of the salary \*\*\*. A police officer shall be considered 'on duty,' while on any assignment approved by the chief of the police department of the municipality he or she serves, whether the assignment is within or outside the municipality." (Emphasis added.) 40 ILCS 5/3—114.1 (West 1994).

■ The important language is emphasized. What do these terms mean? "Incur" is defined as "to become liable or subject to: bring down upon oneself." Webster's Ninth New Collegiate Dictionary 611 (1983). A "result" is "something that results as a consequence, issue, or conclusion." Webster's Ninth New Collegiate Dictionary 1006 (1983). These definitions are consistent with the common law, and both support a construction of section 3—114.1 of the Code that approves a line-of-duty disability pension even though the line-of-duty factors may not be the sole cause of the disability. Both "incur" and "resulting from" are broad and inclusive terms, and the latter is at least as inclusive as the more familiar term, "cause." The word "cause" is defined as each separate antecedent of an event, or something that precedes and brings about an effect or a result. Black's Law Dictionary 221 (6th ed. 1990).

When we turn to an examination of the word "cause," we find that, not unexpectedly, more than one factor can cause an event to occur and, when two or more facts combine to cause something, both are recognized as causes of that event. In ordinary negligence cases, where a person is guilty of the negligence charged against her, it is no defense that some other person, or thing, contributed to bring about the results for which the damages are claimed. *Romine v. City of Watseka*, 341 Ill. App. 370, 377, 91 N.E.2d 76, 79 (1950). This form of jury instruction has even been approved.

> "More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the

plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame." Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989).

"If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury." Illinois Pattern Jury Instructions, Civil, No. 12.05 (3d ed. 1989).

See *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 499 N.E.2d 1373 (1986).

Since "resulting from" is at least as broad as "cause" and since "cause" can encompass more than one cause even in a fault-based system such as the field of negligence, it would be incongruous not to construe "resulting from an act of duty" in accord with the common law principle that there can be more than one cause of an injury. Further, since a person is liable for his or her negligent conduct whether it contributed wholly or partly to the plaintiff's injury as long as it was one of the proximate causes of the injury (see *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 199 N.E.2d 769 (1964)), it would be equally incongruous to deprive a disabled worker of line-of-duty benefits as long as one of the causes of his disability resulted from an act of duty.

Turning from the language of the statute to the case law, we find support in the supreme court's conclusion that the Code and the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1994)) are to be construed similarly. In *Mitsuuchi v. City of Chicago*, 125 Ill. 2d 489, 532 N.E.2d 830 (1988), the supreme court pointed out that the statute governing police pension and disability benefits serves purposes equivalent to workers' compensation. Because of the similar language in the police pension code and the Workers' Compensation Act, and the similarity in purposes to be served by the statutes, the standards developed under the Workers' Compensation Act are applicable to police pensions and disability benefits cases. See *Kellan v. Board of Trustees of the Firemen's Pension Fund*, 194 Ill. App. 3d 573, 582, 551 N.E.2d 264, 269 (1990). Thus, the principle established in cases arising under the Workers' Compensation Act, that evidence of a preexisting physical disability will not bar an award of compensation for a job-related injury caused by the "stress of his usual labor," applies to this case. *Olson v. City of Wheaton Police Pension Board*, 153 Ill. App. 3d 595, 598, 505 N.E.2d 1387, 1389 (1987); *Illinois Valley Irrigation, Inc. v. Industrial Comm'n*, 66 Ill. 2d 234, 362 N.E.2d 339 (1977); *Laclede Steel Co. v. Industrial Comm'n*, 6 Ill. 2d 296, 128 N.E.2d 718 (1955).

Before concluding, we note that the First and Second District Appellate Courts have construed the language of the statutes in a way which almost requires plaintiffs to establish that the sole proximate cause of their disability was on-duty injury. See *Trettenero v. Police Pension Fund*, 268 Ill. App. 3d 58, 643 N.E.2d 1338 (2d Dist. 1994); *Ryndak v. River Grove Police Pension Board*, 248 Ill. App. 3d 486, 618 N.E.2d 606 (1st Dist. 1993); *Batka v. Board of Trustees of the Village of Orland Park Police Pension Fund*, 186 Ill. App. 3d 715, 542 N.E.2d 835 (1st Dist. 1989); *Wall v. Police Pension Board*, 178 Ill. App. 3d 438, 533 N.E.2d 458 (1st Dist. 1988). However, those cases should be compared with the first district cases of *Worth v. Board of Trustees of the Police Pension Fund*, 230 Ill. App. 3d 349, 595 N.E.2d 51 (1992), and *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 630 N.E.2d 446 (1993). *Barber* held:

> "Even if we were to assume that the accident aggravated a preexisting condition \*\*\*, a different conclusion is not reached. The Code states that the debilitating injury must have been incurred or must have resulted from the performance of an act of duty. *There is no requirement that the duty-related incident be the originating or primary cause of the injury*, although a sufficient nexus between the injury and the performance of the duty must exist." (Emphasis added.) *Barber*, 256 Ill. App. 3d at 818, 630 N.E.2d at 449.

From the previous analysis it is obvious we disagree with the holdings that the duty-related incident has to be the sole cause of the injury and agree instead with the *Barber* analysis.

In this case the overwhelming weight of the doctors' testimony was that Robbins' debilitating mental condition was caused, at least in part, by his on-duty functions as a police officer. In view of that fact and in view of the fact that there is no question of his disability, it would serve little purpose to remand this matter to the circuit court. Therefore, under Supreme Court Rule 366 (155 Ill. 2d R. 366), we reverse and enter judgment in favor of plaintiff for a line-of-duty disability pension.

In view of the foregoing, the decision of the circuit court is reversed.

Reversed.

HOPKINS, P.J., and MAAG, J., concur.