NOTICE: Under Supreme Court Rule 367 a party has 21 days after the

filing of the opinion to request a rehearing. Also, opinions are

subject to modification, correction or withdrawal at anytime prior

to issuance of the mandate by the Clerk of the Court. Therefore,

because the following slip opinion is being made available prior to

the Court's final action in this matter, it cannot be considered

the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of

Decisions in the Official Reports advance sheets following final

action by the Court.

                                    

                 Docket No. 80075--Agenda 20--May 1996.

      RAINTREE HEALTH CARE CENTER, Appellant, v. THE ILLINOIS HUMAN

                  RIGHTS COMMISSION et al., Appellees.

                     Opinion filed October 18, 1996.

                                    

     JUSTICE HARRISON delivered the judgment of the court:

     James Davis, the original complainant in this case, filed a

discrimination charge with the Illinois Department of Human Rights

alleging that his employer, Raintree Health Care Center (Raintree),

violated the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch.

68, par. 1--101 et seq.) by discharging him after learning that he

tested positive for the human immunodeficiency virus (HIV). After

a three-day hearing, an administrative law judge (ALJ) concluded

that Raintree had discriminated against Davis by constructively

discharging him on the basis of a physical handicap, his infection

with HIV. The ALJ recommended Davis' reinstatement to his former

position, or a substantially equivalent position with pay and

benefits, and awarded him back pay, plus interest, and reasonable

attorney fees. The Illinois Human Rights Commission upheld the

ALJ's recommended order and decision. Ill. Hum. Rts. Comm'n Rep.

1988CN2190 (April 15, 1994). The appellate court, with one justice

dissenting, affirmed the final order of the Illinois Human Rights

Commission. 275 Ill. App. 3d 387. We allowed Raintree's petition

for leave to appeal. 155 Ill. 2d R. 315.

     The central issue raised in this appeal is whether the

Illinois Human Rights Commission properly determined that

Raintree's constructive discharge of Davis, based on his HIV-

positive status, amounted to a violation of the Illinois Human

Rights Act. To resolve this issue we must also determine whether

public health statutes and regulations in effect at the time of

this action prohibited Davis from working at the Raintree nursing

home and whether Raintree's belief that these regulations did in

fact bar Davis from working at its facility is relevant in

determining liability under the Illinois Human Rights Act. The

final issue raised by Raintree is whether it was entitled to

discovery and a hearing on Davis' petition for attorney fees. For

the reasons which follow, we affirm the judgment of the appellate

court.

     The testimony presented at the evidentiary hearing before the

ALJ established the following facts. Raintree operates a nursing

home facility in Evanston, Illinois. Raintree hired James Davis as

a kitchen helper in March of 1987. Raintree later promoted Davis to

the position of cook at the facility. In June of 1987, Davis was

fired for fighting on the job, but Raintree rehired Davis in

November of 1987, when his supervisor asked him to return. Both

parties stipulated that after Davis was rehired, he performed his

duties as a cook in an acceptable manner consistent with Raintree's

standards. Davis' responsibilities as a cook consisted of preparing

the evening meal, placing the food on trays, and cleaning and

straightening the kitchen and storeroom areas. In performing these

duties, Raintree required Davis to wear gloves. Davis had no direct

contact with the residents of the facility.

     On January 12, 1988, Davis' doctor informed him that he had

tested positive for HIV. After reporting to work that same day,

Davis told his supervisor, Pearl Smith, that he had just been

diagnosed as being HIV-positive. Smith suggested that Davis begin

working while she went to discuss the matter with Burton Behr, the

administrator of the facility. Behr then called Davis into his

office for a meeting. At this first meeting, Behr told Davis that

Raintree needed information from public health officials to

determine whether Davis could continue his employment. Behr then

allowed Davis to return to work. Behr testified that after this

first meeting, he began looking through the Illinois Department of

Public Health regulations and the City of Evanston regulations

governing the licensing of nursing homes. Behr found nothing in the

nursing home regulations that addressed the situation of an HIV-

positive employee.

     Behr testified that on this day, he made several telephone

calls to the Evanston board of health, the Illinois Department of

Public Health, and the Illinois Council on Long Term Care for

advice on how to handle Davis' situation. Behr was unable to

receive a definitive answer as to whether Davis' condition made him

ineligible to work in a nursing home. Behr testified that when he

spoke with Louise Brown, the director of the Evanston board of

health, he explained to her that he "could not find anything in the

rules and regulations anywhere that specifies HIV-positive," and

asked whether Davis could continue working at the facility. Behr

testified that Brown responded, "I can't tell you he can't work

there, but I can tell you if something should occur because he is

working there, then you are subject to the rules and regulations."

Behr replied that "there are no rules and regulations governing

this." Brown again responded, "You will have to go with the rules

and regulations that stand until it can be clarified, so according

to the rules and regulations, he is unable to work there at the

present time ***." Behr also spoke with Rose Ferrell, a regional

supervisor of the Illinois Department of Public Health. Behr

testified that Ferrell simply told him to follow the rules and

regulations and that she would check further and get back to him.

Similarly, Terry Sullivan, the director of the Illinois Council on

Long Term Care, offered no recommendation on how Behr should

proceed.

     After conducting this inquiry, Behr called Davis back to his

office. Behr told Davis that he thought it was best that Davis go

home until he found out more information as to whether the nursing

home regulations prohibited HIV-positive persons from working at

Raintree. Behr advised Davis that when he found out more

information he would telephone him. Behr also requested that Davis

bring a note from his doctor stating that "he was free of a

communicable disease or that he was allowed to work with the HIV

virus." That same week, Davis obtained a doctor's note as Behr

requested. The note, signed by Davis' doctor stated:

               "To Whom It May Concern:

               Mr. James Davis HIV status does not restrict him

          from performing his current job as a cook in a nursing

          home. The HIV (AIDS Virus) is NOT transmitted through the

          preparation or serving of food and beverages.

          Transmission is through blood and body fluids. Should Mr.

          Davis cut himself in the course of the food preparation,

          that food should be discarded the same as if any employee

          had bled into food. Should you have any further

          questions, please contact the nurse with the clinic,

          Kathy Pietschmann, R.N., M.S. at 943-6600 ext. 401.

               Sincerely,

               (Signed) TOM SKOUTELIS

               Tom Skoutelis, M.D."

     Despite the note, Behr did not allow Davis to return to work

at Raintree. Behr testified that the Evanston board of health

informed him that the note was insufficient to permit Davis to

return to work because it did not specify that Davis was free from

a contagious or infectious disease. Behr further stated that he

contacted the nurse referred to in the doctor's note and she just

reiterated the information contained in the note. Behr continued to

communicate with the Illinois Department of Public Health and the

Evanston board of health to try to get an opinion as to whether

Davis' condition made him ineligible to work in a nursing home. As

stated, Behr never received a conclusive answer from either of

these agencies.

     For several weeks after he was initially requested to go home,

Davis contacted the Raintree facility on numerous occasions to find

out if Behr had received an answer from the board of health and if

he could return to work. Each time he called, Davis was told that

Raintree had not yet received an answer from public health

officials. From the time that he left the facility on January 12,

1988, Davis was never contacted by either Behr or Smith and was

never allowed to return to work. Throughout this time when Behr was

seeking an official opinion as to the impact of Davis' condition on

his employment, Davis received no salary from Raintree.

     In early February 1988, Davis' brother, who also worked as a

cook at Raintree, informed Davis that he had been fired. Davis

testified that he believed what his brother told him because he had

not heard from anyone at Raintree for over three weeks. Davis did

not call Raintree or seek confirmation that he had been fired. In

early February, Davis filed for unemployment compensation benefits.

Raintree contested the unemployment claim contending that it had

never terminated Davis' employment. Davis was ultimately denied

unemployment benefits.

      On February 3, 1988, Davis filed a discrimination charge with

the Illinois Department of Human Rights. After an investigation of

the charge, on January 5, 1989, the Department of Human Rights

filed a complaint on behalf of Davis, alleging that Raintree

discriminated against Davis on the basis of a physical handicap. In

February of 1989, Raintree offered Davis another position, at the

same $4.20 rate of pay per hour, at a different nursing home

facility located in Highland Park, Illinois. At the time of the

offer, Davis lived at 43rd and Michigan Avenue in downtown Chicago.

Davis did not own a car and relied on public transportation. The

job at Highland Park was over 40 miles from Davis' home and would

require approximately a 2½-hour commute each way on public

transportation. Davis refused the job due to the long commute.

     The parties appeared for a three-day hearing before an ALJ

beginning on February 24, 1992. Upon consideration of the evidence

presented, the ALJ issued a recommended liability determination on

October 9, 1992. The ALJ found that Raintree discriminated against

Davis by constructively discharging him based on his HIV-positive

status, a protected physical handicap. On October 28, 1992, Davis

filed a petition for attorney fees and costs in the amount of

$42,909.98, supported by affidavits of his counsel and a billing

worksheet. Davis also requested a multiplier in the amount of 50%.

Raintree filed a motion for discovery and depositions regarding the

reasonableness of the attorney fees. After a hearing on Raintree's

motion, the ALJ denied the request for discovery. Raintree

eventually responded to Davis' petition for fees and moved for an

evidentiary hearing and oral argument on these issues. The ALJ

denied Raintree's motion, noting that oral arguments in such a

circumstance were "highly unusual" and that Raintree offered "no

explanation why this case required a variation from standard

procedure." On July 8, 1993, the ALJ issued a recommended order and

decision regarding attorney fees in this case. The ALJ rejected

Davis' request for a fee multiplier of 50%, reduced the hourly rate

requested for two of the attorneys, and rejected Raintree's

challenge to the number of hours billed and the costs requested.

The ALJ awarded Davis $28,956.50 in attorney fees.

     Raintree filed exceptions to the ALJ's recommendations as to

liability and attorney fees with the Human Rights Commission. On

April 15, 1994, the Commission issued its order and decision

adopting the recommended decision of the ALJ and rejecting the

exceptions filed by Raintree. Ill. Hum. Rts. Comm'n Rep. 1988CN2190

(April 15, 1994). The Commission reasoned that Raintree

discriminated against Davis on the basis of a physical condition

which was unrelated to his ability to do the job in question, which

amounted to a violation of the Illinois Human Rights Act. The

Commission noted that the only medical evidence presented was the

doctor's note obtained by Davis, which stated that Davis' infection

with HIV did not restrict him from performing his current job. The

Commission further determined that the guidelines which Raintree

relied on, section 300.650(a)(4) of Title 77 of the Illinois

Administrative Code (77 Ill. Adm. Code §300.650(a)(4) (1985)) did

not bar Davis from working at the facility with his condition. The

Commission concluded that HIV was not included in the list of

"contagious and infectious diseases" outlined in section 690.100 of

Title 77 of the Illinois Administrative Code (77 Ill. Adm. Code

§690.100 (Supp. 1987)) which would have limited Davis' ability to

work in a nursing home. The Commission further held that Raintree's

good-faith belief that the public health regulations prohibited it

from employing Davis was not relevant in determining whether it had

violated the Human Rights Act. Davis died on November 27, 1994, and

his estate was substituted as the complainant in this action in

March 1995.

     On August 25, 1995, the appellate court issued its opinion

confirming the Commission's decision. 275 Ill. App. 3d 387. The

court agreed that firing Davis based solely on his infection with

HIV, a protected physical condition, violated the Human Rights Act.

The court reasoned that before rejecting Davis for employment,

Raintree should have made an individualized determination as to

Davis' ability to perform the work of a cook. The court further

rejected Raintree's argument that its decision to terminate Davis

was compelled by nursing home regulations. The dissenting justice

believed the Commission's decision to be against the manifest

weight of the evidence. He would have held that Raintree's good-

faith belief that it was required to terminate Davis' employment

based on public health regulations exempted it from liability for

handicap discrimination. Raintree now appeals, arguing that the

dissenting justice properly determined that the Commission's

decision was against the manifest weight of the evidence.

      When reviewing a decision by an administrative agency, "the

findings and conclusions of the administrative agency on questions

of fact shall be held to be prima facie true and correct." 735 ILCS

5/3--110 (West 1994). In addition, the Commission's findings of

fact should be sustained unless the court determines that such

findings are against the manifest weight of the evidence. Zaderaka

v. Illinois Human Rights Comm'n, 131 Ill. 2d 172, 180 (1989).

However, a reviewing court is not bound to give the same deference

to an administrative agency's conclusions of law and statutory

construction, and exercises independent review over such questions.

See Illinois Bell Telephone Co. v. Human Rights Comm'n, 190 Ill.

App. 3d 1036, 1046 (1989).

      On this appeal, we will first address whether Raintree's

decision to discharge Davis, because he tested positive for HIV,

constituted employment discrimination under the Human Rights Act.

We will later address whether the existing health regulations

compelled Raintree's discriminatory actions and whether Raintree's

belief that Davis' discharge was required should relieve the

nursing home from liability.

      The Illinois Human Rights Act (the Act) specifically

prohibits discrimination in employment against the physically and

mentally handicapped. Ill. Rev. Stat. 1987, ch. 68, par. 1--102(A).

The term "unlawful discrimination" is defined by the Act as

"discrimination against a person because of his *** handicap." Ill.

Rev. Stat. 1987, ch. 68, par. 1--103(Q). The Human Rights Act

further defines "handicap," for purposes of employment

discrimination, as: "a determinable physical or mental

characteristic of a person, *** the history of such characteristic,

or the perception of such characteristic by the person complained

against, which may result from disease, injury, congenital

condition of birth or functional disorder and which characteristic

*** is unrelated to the person's ability to perform the duties of

a particular job or position." Ill. Rev. Stat. 1987, ch. 68, par.

1--103(I)(1). Finally, the Act provides that it is a civil rights

violation "[f]or any employer to *** discharge *** on the basis of

unlawful discrimination." Ill. Rev. Stat. 1987, ch. 68, par. 2--

102(A). Therefore, under the Act, it would be unlawful for an

employer to fire an employee because of his physical handicap, if

that handicap was unrelated to his ability to perform his job

duties. Such a firing would be deemed "unlawful discrimination"

based on a physical handicap under the terms of the Human Rights

Act.

     Respondents, the estate of Davis and the Illinois Human Rights

Commission, assert that it is undisputed that Davis' HIV infection

is a protected condition under the Act. We agree that infection

with HIV is a determinable physical characteristic resulting from

a disease which has been held to be a qualifying condition under

civil rights laws. See Doe v. Kohn, Nast & Graf, P.C., 862 F. Supp.

1310, 1321 (E.D. Pa. 1994); Doe v. District of Columbia, 796 F.

Supp. 559, 568 (D.D.C. 1992). The issue then becomes whether Davis'

handicap was unrelated to his ability to perform his job duties,

rendering his termination unlawful.

     Traditionally, when analyzing employment discrimination claims

under the Human Rights Act, Illinois courts and the Commission

generally apply a three-part analysis. Zaderaka v. Illinois Human

Rights Comm'n, 131 Ill. 2d 172, 178-79 (1989). First, under this

analysis, "plaintiff must establish by a preponderance of the

evidence a prima facie case of unlawful discrimination." Zaderaka,

131 Ill. 2d at 178-79. Second, to rebut the presumption that an

employer unlawfully discriminated against an employee, the employer

must articulate a legitimate, nondiscriminatory reason for its

decision, such as an employee's poorly performing his job,

committing some act of misconduct, or missing excessive days of

work. Finally, if an employer articulates a legitimate,

nondiscriminatory reason, then plaintiff must prove by a

preponderance of the evidence "that the employer's articulated

reason was not its true reason, but was instead a pretext for

unlawful discrimination." Zaderaka, 131 Ill. 2d at 179.

     Although this is the conventional formulation, this three-part

analysis is not useful in the case before us because, here, there

is no dispute as to why Raintree discharged Davis. The facts

establish that the sole reason Raintree terminated Davis was

because he tested positive for HIV. Where, as here, the reasons for

an adverse job action are uncontroverted, the dispositive issue is

simply whether the handicapped person could perform the particular

work involved. See Board of Trustees of the University of Illinois

v. Human Rights Comm'n, 138 Ill. App. 3d 71, 75 (1985).

     As stated, the Illinois Human Rights Act provides that adverse

employment actions cannot be taken against any person due to his or

her physical handicap if the handicap is unrelated to the person's

ability to perform job duties. Ill. Rev. Stat. 1987, ch. 68, par.

1--103(I)(1). Courts have applied this principle to require

employers to make individualized determinations of whether a

particular handicapped employee or applicant is able to perform the

work required by a particular job. See Board of Trustees, 138 Ill.

App. 3d at 75; Melvin v. City of West Frankfort, 93 Ill. App. 3d

425, 429 (1981). An individualized determination of a handicap

person's abilities is required because "it is the express policy of

this State that eligibility for employment be based upon individual

capacity." See Melvin, 93 Ill. App. 3d at 429.

      In Melvin, the court examined whether a section of the

Illinois Municipal Code which barred amputees from employment

eligibility with the fire and police departments, except for

clerical duties, was unconstitutional. The court reasoned that the

Illinois Constitution, article I, section 19 (Ill. Const. 1970,

art. I, §19), prohibits "distinctions in hiring handicapped

individuals which are not related to the ability of a particular

applicant to satisfactorily perform particular work." See Melvin,

93 Ill. App. 3d at 429. The court noted that these guarantees set

forth by article I, section 19, have since been implemented by the

Illinois Human Rights Act which prohibits discrimination in

employment based on a physical handicap. See Melvin, 93 Ill. App.

3d at 430. The court concluded that this section of the Municipal

Code was unconstitutional because the regulation imposed a blanket

restriction against all amputees and failed to allow for an

individualized determination of whether a particular person could

perform a particular job. See Melvin, 93 Ill. App. 3d at 429-31.

     In Board of Trustees, the court applied the standard

enunciated in Melvin to hold that the University of Illinois

discriminated against an amputee because it did not make a more

thorough inquiry into plaintiff's ability to overcome his handicap

and perform the duties required. See Board of Trustees, 138 Ill.

App. 3d at 76. In Board of Trustees, an amputee who had been a

sheet metal worker for over 17 years applied for a sheet metal

position with the university. The university would not hire him due

to his amputation. The court held that the university unfairly

discriminated against the plaintiff by deciding not to hire him

without first testing his agility or ability to climb, and without

any evidence that his handicap impaired his past work performance

as a sheet metal worker. See Board of Trustees, 138 Ill. App. 3d at

75. The court further noted that the reason for rejecting plaintiff

seemed to be "a good faith but overly cautious decision after an

insufficiently thorough investigation" of whether this particular

handicapped person could perform the particular work involved. See

Board of Trustees, 138 Ill. App. 3d at 76.

     In this case, both the appellate court and the Commission

found that Raintree did not prove that it had made an

individualized determination of Davis' ability to perform his job

duties without undue harm to himself or others. 275 Ill. App. 3d at

395. The appellate court and the Commission also noted that the

only medical evidence submitted, the doctor's note, stated that

Davis' handicap would not prevent him from performing his job as a

cook. We agree with the appellate court's holding.

      In the case at bar, Raintree discharged Davis without making

a determination on its own whether employing Davis as a cook would

pose a risk to its residents. The doctor's note was the only

medical evidence presented, and it established that Davis'

infection with HIV was unrelated to his ability to perform his

duties as a cook at Raintree. The note specifically stated that

Davis' HIV status did not restrict him from performing his job as

a cook and that HIV was not transmitted through food preparation.

Raintree presented absolutely no contrary medical evidence. Nothing

in the record indicates that Raintree made any inquiry as to how

HIV is transmitted or whether there was any risk of an HIV-infected

cook passing on the disease to nursing home residents. There is no

evidence that Raintree spoke to any other doctors, such as the ones

working at their nursing home facility, or consulted any medical

literature as to the characteristics and risks of transmission of

HIV. Raintree was only concerned with receiving a definitive answer

from the Department of Public Health or the Evanston board of

health as to whether it would violate any rules or regulations to

continue to employ Davis. Raintree's actions do not constitute an

individualized inquiry as to whether James Davis could safely

perform his duties as a cook with the HIV virus. But rather, just

as the University of Illinois in the Board of Trustees decision,

here, Raintree seems to have made an overly cautious decision after

an insufficiently thorough investigation which resulted in unfair

treatment for Davis. Illinois courts have not tolerated blanket

restrictions against the employment of amputees in Melvin and Board

of Trustees and we will not allow such an unqualified bar against

the employment of an individual inflicted with HIV. We conclude

that Raintree's constructive discharge of Davis amounted to

unlawful discrimination in violation of the Illinois Human Rights

Act.

     Raintree argues that the public health regulations outlining

nursing home policies in existence at the time of this action,

prohibited Davis from working in its nursing home. Specifically,

Raintree refers to section 300.650(a)(4) of Title 77 of the

Illinois Administrative Code, which outlined personnel policies for

nursing homes and provided:

               "An employee diagnosed or suspected of having a

          contagious or infectious disease shall not be on duty

          until such time as a written statement is obtained from

          a physician that the disease is no longer contagious or

          is found to be noninfectious." 77 Ill. Adm. Code

          §300.650(a)(4) (1985).

Raintree contends that Davis' infection with HIV constituted a

diagnosis of a contagious and infectious disease and that section

300.650(a)(4) prevented such an employee from working in a nursing

home. According to Raintree, section 300.650(a)(4), on its face,

encompassed HIV as a contagious and infectious disease and no

extrinsic sources needed to be consulted. Furthermore, Raintree

notes that since the Public Health Code compelled it to terminate

Davis because of his HIV status, it cannot be held liable under the

Human Rights Act. It is Raintree's position that section

300.650(a)(4) conflicted with the Human Rights Act and required it

to commit a discriminatory employment action against Davis to

comply with the health regulations governing nursing homes.

Raintree argues that complying with health regulations is a

legitimate reason for terminating Davis' employment.

     In this case, both the Commission and the appellate court held

that section 300.650(a)(4) did not serve to bar Davis from working

at Raintree because HIV was not considered a contagious and

infectious disease. 275 Ill. App. 3d at 394. The appellate court

and the Commission noted that the section in question,

300.650(a)(4), did not define the terms contagious and infectious

disease. Both the Commission and the appellate court turned to

section 690.100 for such a definition. 77 Ill. Adm. Code §690.100

(Supp. 1987). Section 690 was cross-referenced in section

300.650(a)(3)(A), which was the same subject regulation as

300.650(a)(4). In general, section 300.650 outlined personnel

policies for nursing homes, and made reference to section 690 which

addresses the reporting and control of communicable diseases.

     Section 690.100 lists reportable diseases and conditions and

specifically states: "The following are declared to be contagious,

infectious, communicable and dangerous to the public health and

each suspected or diagnosed case shall be reported to the Illinois

Department of Public Health." 77 Ill. Adm. Code §690.100 (Supp.

1987). The section goes on to list a number of contagious,

infectious, communicable and dangerous conditions and diseases.

AIDS is among the diseases listed, but the status of being HIV

positive is not on the list. There are no other regulations

declaring which diseases are considered contagious and infectious

to the public or which diseases must be reported to protect the

safety of others. We cannot interpret section 300.650(a)(4) as

referring to all possible contagious and infectious diseases, when

another section, which was cross-referenced in the subject

regulation, specifically lists which diseases the Illinois

Department of Public Health considers to be contagious, infectious,

communicable, and dangerous. We hold that the terms "contagious"

and "infectious" are terms of art defined within section 690.100 of

the public health regulations, and if the disease was not included

in the list, it is not considered to be "contagious" or

"infectious." It is undisputed that when Davis was terminated in

January 1988, he did not suffer from AIDS, and was just diagnosed

as having HIV. Since HIV was not listed within section 690.100, it

was not considered a contagious and infectious disease for purposes

of applying section 300.650(a)(4). Therefore, section 300.650(a)(4)

did not serve to bar Davis from continuing his employment with

Raintree or require him to obtain a doctor's clearance.

     Raintree argues that the distinction drawn between HIV and

AIDS by the appellate court and the Commission in this case was

inappropriate and irrational. However, other sections in these

public health regulations support this distinction. At the time of

this action, section 690.290, part of the chapter on the control

and reporting of communicable disease, defined a suspected case of

AIDS as having two or more of the following signs or symptoms:

"unexpected weight loss of greater than 10% body weight, chronic

fever, chronic lymphadenopathy, night sweats and chronic diarrhea."

77 Ill. Adm. Code §690.290(a) (Supp. 1987). This definition did not

encompass the status of being HIV positive and showing no visible

signs of AIDS. In addition, the regulation goes on to state, at

section 690.290(d), that "Persons who are prohibited from donating

blood *** because of evidence of infection with HTLV-III virus,

increased risk of infection with HTLV-III virus, AIDS or suspected

AIDS may make donations for the limited purpose of autologous

transfusion, instillation, transplantation or injection." 77 Ill.

Adm. Code §690.290(d) (Supp. 1987). Furthermore, section

690.290(c)(3) provides that all blood and serum from blood donors

should be tested for HTLV-III. 77 Ill. Adm. Code §690.290(c)(3)

(Supp. 1987). The term HTLV-III was an early name for HIV, and was

referred to as a separate condition, distinct from AIDS, in

sections 690.290(c) and (d). Accordingly, from the references in

sections 690.290(a), (c), and (d), it is clear that the Department

of Public Health recognized the difference between HIV-positive

status and AIDS in 1988. Therefore, the Department's reference to

AIDS as an infectious and contagious disease cannot be interpreted

as automatically including the condition of HIV. When the

Department meant HIV in other regulations, it referred to it

separately or as its early name HTLV-III. We hold that on its face,

the regulation in question did not prevent employees infected with

HIV from working in nursing homes.

     Moreover, Raintree cites the language of section 300.650(a)(4)

of Title 77 of the Illinois Administrative Code as completely

justifying its decision to terminate Davis, reasoning that the

section required Raintree to prevent an HIV-positive cook from

working at its facility. However, the language from section

300.650(a)(4) was not a blanket restriction compelling all

employees with HIV to be terminated and never allowed to return to

their nursing home jobs. Rather, section 300.650(a)(4) allowed

employees diagnosed as having contagious or infectious diseases to

return to work after obtaining a doctor's note stating the disease

was no longer contagious or found to be noninfectious.

     Although Davis himself was not subject to the note

requirement, he obtained such a note and presented it to Burton

Behr. The note, signed by Davis' physician, explained that Davis'

HIV status did not prevent him from performing his job as a cook

and that HIV was not transmitted through food preparation or

service. Behr stated that he was informed by the Evanston board of

health that the note was inadequate because it did not state that

Davis was free of contagious or infectious disease. However, Behr

did not specify that the note had to contain this exact language.

Behr admitted at the hearing before the ALJ that he asked Davis to

get documentation stating "that he was free of a communicable

disease or that he was allowed to work with the HIV virus." Davis

complied producing a note which stated that his infection with HIV

did not restrict him from performing his job as a cook. Yet

Raintree refused to return Davis to work, and never contacted Davis

to give him further information explaining what he could do to

return to work.

      We hold that Davis was not required to present a note since

section 300.650(a)(4) did not apply in this case. However, even if

this section applied to Davis, the doctor's note which he provided

may have complied with the provisions of section 300.650(a)(4), and

certainly complied with the instructions he was given from Burton

Behr. At this point, Raintree should have conducted its own

investigation concerning whether it was safe to return Davis to

work, and contacted Davis to give him a chance to comply with any

further requirements in order to get his job back.

     Raintree next argues that even if it improperly interpreted

the regulation in question, its good-faith belief that Davis'

continued employment was in violation of section 300.650(a)(4)

relieved it from liability under the Illinois Human Rights Act.

Raintree contends that it was entitled to rely on the Evanston

health department director's interpretation of the subject

regulation. According to Raintree, Louise Brown, the director of

the Evanston health department, informed him that Davis could not

work at Raintree at the present time, and that his doctor's note

was inadequate. Raintree states that when it sent Davis home it was

only making a good-faith attempt to comply with state law as

interpreted by the Evanston health department. The dissenting

justice in the appellate court agreed that the only reason for

Davis' termination was Behr's good-faith belief that keeping Davis

would be a violation of section 300.650. Both Raintree and the

dissenting appellate court justice assert that under the reasoning

of Le Beau v. Libbey-Owens-Ford Co., 727 F.2d 141 (7th Cir. 1984),

a good-faith belief that one's actions are required to comply with

state law is a defense to liability under the Illinois Human Rights

Act.

     The Le Beau case was a gender discrimination suit concerning

a conflict between a state law prohibiting women from working

overtime and Title VII of the Civil Rights Act of 1964, which

forbade employers from refusing to offer overtime work to women. In

Le Beau, plaintiffs, female employees of Libbey-Owens-Ford, brought

suit claiming that defendants violated Title VII by restricting

females to employment in only two departments, and by employing men

in departments where overtime was required, while employing women

in departments where overtime was less frequent. Beginning in 1909,

Illinois had in effect the Illinois Female Employment Act (Ill.

Rev. Stat. 1908, ch. 48, par. 25), which provided that women could

not work more than eight hours in any one day or more than 48 hours

in any one week. Therefore, Libbey-Owens-Ford separated men and

women into these two different departments, placing men in the

continuous operations of glass production because these jobs

frequently required overtime. In making their employment decisions,

Libbey-Owens-Ford relied on 1965 guidelines promulgated by the

Equal Employment Opportunity Commission (EEOC) providing that state

laws protecting women against overtime work would be considered by

the EEOC as bona fide occupational qualifications not in conflict

with Title VII. In Le Beau, the court held that the employer did

not violate Title VII because it relied in good faith on these 1965

EEOC guidelines. See Le Beau, 727 F.2d at 149.

     We find that Le Beau is distinguishable from the case at bar,

and its reasoning should not be applied to create a good-faith

defense to liability under the Human Rights Act when the state

regulation Raintree relied on did not even apply in this case.

Title VII contains a defense to liability for a civil rights

violation when it was pleaded and proved that the act or omission

complained of was in good faith and in reliance on "any written

interpretation or opinion" of the EEOC. 42 U.S.C. §2000e--12(b)

(1994). In the Le Beau decision, the employer, Libbey-Owens-Ford,

relied on EEOC guidelines which specifically stated that actions to

protect women from exploitation and hazard would not violate Title

VII. Therefore, in Le Beau, the employer's actions fell under this

good-faith defense to liability. The Human Rights Act does not

contain any good-faith exemption analogous to the exemption in

section 2000e--12(b) of the Civil Rights Act. Nowhere does the

Human Rights Act state that a good-faith belief that one's

discriminatory actions are required by state law is a defense to

liability. A statute must be enforced as enacted by the

legislature. Abrahamson v. Illinois Department of Professional

Regulation, 153 Ill. 2d 76, 91 (1992). Because the Human Rights Act

does not contain a good-faith exemption, we will not apply the

reasoning from Le Beau to create one.

     Moreover, in Le Beau, there was an actual conflict with the

Illinois Female Employment Act preventing overtime employment for

women and Title VII. In the case at bar, there was no conflict

between the state regulation and the Illinois Human Rights Act.

This is because the state regulation does not even apply in this

case. We previously stated that section 300.650(a)(4) did not ban

Davis from working at Raintree because his HIV-positive status was

not considered a contagious or infectious disease. An employer's

good-faith belief that it is required to discriminate under another

law is of no legal consequence when that law does not apply. Unlike

the employer in Le Beau, Raintree was not required to violate one

act to comply with another. In Board of Trustees, the court held

that a good-faith belief that an employment restriction is

justified did not negate the impropriety of unfairly denying a

handicapped plaintiff employment. We agree that the question is not

whether Raintree had a good-faith belief that the rules prohibited

Davis from working at a nursing home with the HIV virus, but

whether in fact the rules so provided. We find that Raintree's

alleged good-faith belief, that it was required to terminate Davis,

is irrelevant in determining liability under the Human Rights Act.

     Furthermore, we find it questionable whether the facts of this

case even support a finding that Raintree was acting in good faith.

Raintree contends that it believed in good faith that it was

required to fire Davis to comply with the regulation, yet the ALJ

and the Commission determined that Raintree never received a

definitive answer from health authorities regarding whether Davis

could continue to work there. The only information close to a

definite answer was from Louise Brown, the Director of the Evanston

board of health. Brown first stated that she could not tell Behr

that Davis could not work there, but that if something should

occur, Raintree would be subject to the rules and regulations.

Brown went on to state that Behr should go with the rules and

regulations until it could be clarified, "so according to what is

in the rules and regulations, he is unable to work there at the

present time." Raintree claims that it should be permitted to rely

on Brown's interpretation of the subject regulation. However,

section 300.650(a)(4), the regulation cited by Raintree, is an

Illinois Department of Public Health Regulation. Raintree has not

cited any authority indicating that it was permitted to rely on a

local official's construction of state law. In addition, this

information from Brown was not a definitive interpretation of the

regulation. She merely told Behr that Davis should not work at

Raintree until the regulations could be clarified.

     Raintree claims that its actions were compelled by state

regulations and Brown's directives, yet it still clings to its

assertion that neither the public health regulations nor the public

health authorities ever gave it guidance on how to handle Davis'

situation. Behr claims that throughout the entire time Davis waited

for a decision, he attempted to obtain an official opinion

regarding Davis' future employment. Behr concedes that he never

received a definitive answer. Behr also admitted that the

regulation itself did not specifically address the situation of an

HIV-positive employee when he testified that he did not "find

anything in the rules and regulations anywhere that specifies HIV-

positive." Raintree cannot persuasively argue that Behr's

subjective belief was that the regulation unequivocally prohibited

Davis from working at the facility, when throughout his testimony

Behr maintained that he never really knew what to do about Davis.

      Furthermore, if Raintree had a strong belief that Davis'

continued employment would be in violation of public health

regulations, one would have expected Raintree to have contacted

Davis and explained to him that it would have to let him go to

comply with state law. However, Davis was never contacted by

Raintree, and every time he called Raintree to find out his status,

it informed him that it was still searching for an answer as to

whether the public health regulations actually prohibited his

employment. In addition, the evidence Davis presented, which proved

that it was safe for him to continue to work at Raintree, was

dismissed as insufficient. Without any medical inquiry or

discussion, Raintree concluded that the doctor's note Davis

obtained was completely inadequate, in spite of the fact that the

note complied with the instructions given by Behr himself.

Accordingly, even if Raintree's good faith were a defense under the

Human Rights Act, it could not be invoked by Raintree here.

     Raintree next makes a very brief argument that the Human

Rights Act and the health regulation in question failed to give it

adequate notice of what conduct was warranted or prescribed under

these circumstances. According to Raintree, to hold it liable under

the Human Rights Act for its efforts to comply with the law

violates its due process rights and amounts to a taking of property

without just compensation. We need not consider the merits of these

constitutional issues because Raintree concedes that it raised this

argument for the first time in its petition for rehearing before

the appellate court. It is well established that "issues not raised

during an administrative proceeding are waived and will not be

considered for the first time on appeal." See Illinois Bell

Telephone Co. v. Human Rights Comm'n, 190 Ill. App. 3d 1036, 1044

(1989).

     Finally, Raintree contends that it was entitled to discovery

and a hearing on Davis' petition for attorney fees and that the

award of attorney fees constituted an abuse of discretion by the

ALJ. According to Raintree, a party who is charged with the payment

of attorney fees should be afforded an evidentiary hearing and

ample opportunity to cross-examine as to the reasonableness of the

amounts claimed. Raintree claims that it is entitled to such a

hearing because in its response to Davis' petition for attorney

fees it raised numerous issues concerning the credibility,

authenticity, and reliableness of the attorney's time records and

whether they were kept contemporaneously and in the normal course

of litigation.

     It is well established that it is within the discretion of the

trier of fact to determine the reasonableness of the attorney fees

requested, and a court of review should not make a de novo decision

as to the appropriate award of attorney fees. See Harris Trust &

Savings Bank v. American National Bank & Trust Co., 230 Ill. App.

3d 591, 598-99 (1992). The Illinois Human Rights Act specifically

states that upon a finding of a civil rights violation, an ALJ may

recommend and the Commission may require that reasonable attorney

fees be paid to the complainant for the cost of maintaining the

action. Ill. Rev. Stat. 1987, ch. 68, par. 8--108(G). The Human

Rights Commission's rules governing petitions for attorney fees and

costs impose no requirements that a hearing be conducted to resolve

contested issues regarding claims for fees. But rather, the rule

states that the ALJ "may convene a hearing to resolve contested

issues and may take other steps to produce a complete record with

regard to a claim for fees and/or costs." 56 Ill. Adm. Code

§5300.765(e) (1996). The rules go on to state that after the

submission of the petition for fees and objections thereto "and the

completion of a hearing, if any, the Administrative Law Judge shall

prepare a Recommended Order and Decision." 56 Ill. Adm. Code

§5300.765(f) (1996). Under these authorities, it is within the

ALJ's discretion to determine whether or not a hearing is

necessary. As long as the ALJ is able to determine what amount

would be a reasonable award of attorney fees, from evidence

presented in the petition and the answer, such a determination

should not be disturbed on review.

     Furthermore, courts frequently award attorney fees without

discovery by the party charged with paying them and without holding

evidentiary hearings. In Singer v. Brookman, 217 Ill. App. 3d 870,

880 (1991), the appellate court affirmed the trial court's award of

attorney fees and costs as sanctions, without holding a hearing.

The Singer court found that the attorney fees awarded by the lower

court without an evidentiary hearing were not unreasonable and were

properly determined "after a detailed breakdown of fees and

expenses by defendant's counsel." See Singer, 217 Ill. App. 3d at

880. In addition, in Kellett v. Roberts, 276 Ill. App. 3d 164, 174-

75 (1995), the court held that the trial court did not err in

failing to hold a hearing on the amount of sanctions or attorney

fees. The court reasoned that since the trial court was able to

rely on the plaintiff's attorney's legally sufficient affidavit and

detailed time sheet, and defense counsel was not denied an

opportunity to present evidence, "the trial court did not err in

failing to hold a hearing on the amount of fees." See Kellett, 276

Ill. App. 3d at 175.

     In this case, once a civil rights violation was established,

and the ALJ and Commission decided to award attorney fees, all that

remained was a determination of the amount. The ALJ carefully

examined the fee petition, affidavits, the detailed billing

worksheet submitted by Davis' counsel, and the written response

submitted by Raintree, to calculate what amount would be considered

a reasonable fee. Based on this evidence, the ALJ reduced the

hourly rate requested for two of Davis' attorneys, rejected the

request for a fee multiplier, and reduced the requested amount of

$42,909.98 to an award of $28,956.50. The Commission affirmed this

recommendation. We hold that the ALJ did not err in failing to hold

a hearing on Davis' petition for attorney fees.

     For the foregoing reasons, we affirm the judgment of the

appellate court.

Affirmed.

                                                                         

     CHIEF JUSTICE BILANDIC, specially concurring:

     I concur in the plurality opinion except for its discussion of

two issues.

     First, the plurality needlessly restricts the definition of

"contagious" or "infectious" disease in section 300.650(a)(4) of

the public health regulations to those diseases actually listed in

section 690.100 of the regulations. Slip op. at 12-14. The

plurality states that because section 690.100 did not list HIV as

being a "contagious" or "infectious" disease at the time of Davis'

discharge, then HIV infection was not considered, for purposes of

section 300.650(a)(4), to be a "contagious" or "infectious"

disease. In my view, the plurality thereby unnecessarily and

unwisely limits the term "contagious" or "infectious" disease as

used in section 300.650(a)(4). This case can be resolved without

the potentially far-reaching holding that if a disease is not

listed in section 690.100, then it is not considered to be

"contagious" or "infectious" under section 300.650(a)(4).

     As the plurality later concludes, Raintree's argument that it

was required to discharge Davis pursuant to section 300.650(a)(4)

fails even if HIV was a "contagious" or "infectious" disease within

that section because Raintree failed to comply with the provisions

of that section. Slip op. 14-15. Section 300.650(a)(4) expressly

allows employees diagnosed as having "contagious" or "infectious"

diseases to return to work after obtaining a doctor's note stating

that the disease "is no longer contagious or found to be

noninfectious." In this case, Davis obtained a note from his doctor

explaining that his HIV status did not prevent him from performing

his job as a cook and that HIV was not transmitted through food

preparation or service. Raintree was informed by the Evanston board

of health that the note was inadequate. Under these circumstances,

the plurality opinion finds that Raintree should have contacted

Davis to give him a chance to comply with any further requirements

necessary for him to return to work and also should have conducted

its own investigation to determine whether it was safe for Davis to

return to his position as a cook. Raintree, however, did nothing in

response to Davis' note. Raintree therefore did not comply with

section 300.650(a)(4). Raintree's argument that it was compelled to

commit a discriminatory employment action in order to comply with

the public health regulations therefore fails even if HIV was a

"contagious" or "infectious" disease within the meaning of those

regulations.

     Limiting the definition of "contagious" or "infectious"

disease, as the plurality opinion does, is not only unnecessary, it

is also ill-advised. New diseases may develop that are "contagious"

or "infectious." An employer should not be precluded from relying

on section 300.650(a)(4) to protect the public health merely

because such disease has not yet been listed in section 690.100.

     Second, I do not join in the plurality's broad holding that a

good-faith defense to liability does not exist for violations of

the Human Rights Act. Slip op. at 15-17. I would not resolve in

this case whether the Human Rights Act bars all good-faith defenses

to liability. Like the plurality, I agree that the facts of this

case show that Raintree did not act in good faith. Slip op. at 17-

18. I would therefore limit this court's holding to only the facts

of this case.

     For these reasons, I do not join in either of the

aforementioned discussions.

     JUSTICES MILLER, HEIPLE and McMORROW join in this special

concurrence.